*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

                                                    Nos. 02-1386/1461/1570
        *v.*

MARVIN CHARLES GABRION, II,
                *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00076—Robert Holmes Bell, District Judge.

Argued: June 6, 2012

Decided and Filed:  May 28, 2013

Before:  BATCHELDER, Chief Judge; MARTIN, BOGGS, MOORE, COLE, CLAY,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Barry J. Fisher, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Albany, New York, for Appellant.    Timothy P. VerHey, UNITED STATES
ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:** Kevin
McNally, Margaret O'Donnell, McNALLY & O'DONNELL, Frankfort, Kentucky, Judy
Clarke, CLARKE & RICE, San Diego, California, for Appellant.  Joseph C. Wyderko,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Donald A. Davis,
Jennifer L. McManus, Timohty P. VerHey, UNITED STATES ATTORNEY'S OFFICE,
Grand Rapids, Michigan, for Appellee.

        KETHLEDGE, J., delivered the opinion of the court, in which BATCHELDER,
C.J., and BOGGS, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN,
and DONALD, JJ., joined.  CLAY, J. (pp. 35–37), delivered a separate opinion
concurring in the judgment only, in which COLE, J., joined.  MOORE, J. (pp. 38–65),
delivered a separate dissenting opinion, in which MARTIN, WHITE, and STRANCH,
JJ., joined.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.   Marvin Gabrion was scheduled to be tried in Michigan state court for a rape charge on June 5, 1997.  But that trial never happened. Two days before the trial was set to begin, Gabrion abducted Rachel Timmerman—the 19-year-old woman he allegedly raped—and took her to a remote location in the Manistee National Forest, bound and gagged her and weighed her down with concrete blocks, put her in an old metal boat, and then threw her overboard, alive, into a shallow, weedy lake, where she drowned.  Gabrion also abducted and killed Timmerman's infant daughter.

Timmerman's murder was a federal offense because it occurred in a National Forest.  *See* 18 U.S.C. § 1111(b).  A federal jury later convicted Gabrion of murder and recommended that he be sentenced to death.   The district court sentenced him accordingly.    Gabrion now challenges his conviction and sentence on numerous grounds.  We reject all of his arguments, and affirm.

I.

A.

On the morning of August 7, 1996, Rachel Timmerman arrived at her mother's trailer home in Newaygo County, Michigan, hysterical and bleeding from a laceration on her nose.  She said that a man named Marvin Gabrion had raped her the night before. Timmerman was then 19 years old and had given birth to a baby girl, Shannon Verhage, just six weeks earlier.  Rachel told her mother that she was afraid to press charges because Gabrion had said that, if she did, he would kill both her and her baby.  But that afternoon Rachel reported the rape to the Newaygo County Sheriff.  Two months later, the county prosecutor charged Gabrion with the rape.  For the next three months, however, the police were unable to find him.

On January 20, 1997, the Sheriff's deputies found and arrested Gabrion. They gave him an arrest warrant that named three witnesses for the rape charge: Timmerman herself; Wayne Davis, an associate of Gabrion's who had been with him the night of the rape; and Gabrion's teenaged nephew, Mikey Gabrion. Marvin Gabrion was jailed after his arrest, but was released after a friend (to whom Gabrion said he was jailed for DUI) posted bond for him on February 3, 1997.

Timmerman herself was in jail for a minor drug charge when Gabrion was released, but another witness, Davis, was free for the time being. Within days of Gabrion's release, Gabrion made his way to Davis's residence in White Cloud, Michigan. Davis himself was set to report to jail on February 13 for a 90-day term resulting from a DUI charge. His friend Darlene Lazo had agreed to drive Davis to jail that morning. The afternoon before Davis was scheduled to report, Lazo encountered Gabrion at Davis's home, working on a car. When Lazo arrived the next morning to give Davis a ride to jail, he was missing. Left behind, on a kitchen chair, was an army jacket that Davis always wore. His personal effects in the house likewise seemed untouched, except that his stereo equipment was missing. Davis was never seen alive again. A few weeks after Davis's disappearance, Gabrion tried to sell Davis's stereo equipment at a local consignment shop, with the serial numbers ground off.

On May 5 Timmerman was released from jail. Twice that month she encountered Gabrion and called the Sheriff's office in a panic afterwards, saying that she thought he would kill her. Meanwhile, a young friend of Gabrion's, John Weeks, repeatedly called Timmerman to ask her on a date. Rachel did not know that Weeks was calling at Gabrion's direction. Finally, on June 3—two days before Gabrion's rape trial was set to begin—Rachel told her father that a boy had invited her to dinner that night, and that she would be home in a couple of hours. She said she was bringing her baby along because the boy had specifically asked her to. Rachel's father never saw either of them alive again.

The day after Timmerman's disappearance, several other people saw her with Gabrion and another man in the vicinity of Oxford Lake, which lies partly in the

Manistee National Forest. In early June—almost certainly on June 4—Bonnie Robinson was driving away from her farm in the vicinity of Oxford Lake. As she approached a one-lane bridge, she encountered an old pickup truck driving fast the other way, towards the lake. Inside the truck were two men with a large blond woman (a description matching Rachel) sitting between them. The driver "seemed to be very angry about something." A metal boat was sticking out of the truck's bed.

Kathy Kirk similarly testified that she and her mother had parked at Oxford Lake, near the mud ramp, when an old pickup truck with a boat sticking out the back pulled up alongside them. Gabrion was driving and a young blond woman (whose photo Kirk later saw on the news) was sitting between him and another man (who was almost certainly Weeks). Twice the blond woman looked up at Kirk, and then looked down again. Soon Kirk and her mother drove off.

Finally, again on June 4, Pearl and Bob Hall were driving along a narrow two-track road towards Oxford Lake. As they got near the lake, an old pickup truck with a boat sticking out came fast the other way. This time Gabrion was driving alone, looking "like he was really mad. He was just glaring." Hall had to pull off into the bushes to avoid a collision. As Gabrion drove past, "it sounded like there was stuff in the boat to make it rattle." When the Halls got down to the lake, they saw marks in the mud ramp where someone had recently dragged out a boat.

One evening later that same week, Gabrion and John Weeks approached several campers at a nearby campground. Gabrion introduced himself as Lance (an alias he frequently used) and asked whether he could store his boat at the other campers' site, explaining that his own site was too crowded to keep it there. They agreed. One of the campers, Dan Basset, said that Gabrion was "skittish, nervous, didn't talk much." Basset also said that Gabrion "always wore gloves[,]" even though it was warm out. Basset later came upon Gabrion's campsite while looking for firewood. Gabrion was standing by the fire, with gloves on. The campsite was nowhere near the area where Gabrion had said it was, and had plenty of room to store a boat.

Around 3:30 a.m. on June 6—two days after Gabrion was seen with Timmerman near Oxford Lake—one of Gabrion's neighbors in town, Trevor Zylstra, awoke to the sound of "a very loud bang[.]"  Zylstra looked out the window and saw Gabrion dragging a metal boat on his gravel driveway.  Once Gabrion got the boat to the side of the garage, Zylstra saw him remove two life vests, three concrete blocks, and a length of chain.  Then Gabrion pulled the boat into the garage and ground off the boat's registration numbers.

Almost a month later—on July 5, 1997—Douglas Sortor and his son-in-law Nathan prepared to launch a small fishing boat at the same ramp that Gabrion had visited.  They saw an object floating about 100 yards offshore.  They looked at the object through binoculars and thought it appeared to be a human torso.  They decided to investigate.  The weeds between the ramp and the object were too thick to row through, so Sortor rowed to the South and then circled back towards the object.  As they came close, they saw feet protruding from the water.  Sortor said they hoped it was "a dummy" of some kind.  Then the odor hit them and they realized the object was a human body.  It was Rachel's.  The body was face-up with a concrete block attached to the front, near the waist.  The body was fully clothed.  Rachel's left leg and waist were tightly bound with a shiny metal chain and two padlocks.  A second concrete block was also attached to the body through the chain.  Rachel's wrists were handcuffed tightly behind her back.  Her eyes and mouth were bound with duct tape; her nose had been left uncovered.  The water in that area was about 3 feet deep, with 82 feet of soft muck beneath.  About one-third of the body was covered in muck.  The body had surfaced as a result of bacterial gassing.

Gabrion's whereabouts at that time were unknown, but the police promptly began investigating him as a suspect.  They executed a search warrant at his residence and found two keys that matched the padlocks on Rachel's body.  They also found concrete blocks that were stained with the same tar and paint materials as the blocks attached to Rachel's body.  Gabrion's nephew, Mikey, led Sheriff's deputies to a campsite that his uncle frequently used.  The site was north of Oxford Lake, down a two-track in a dense,

remote area. Gabrion's tent was still pitched there. Scattered about they found bolt cutters, another length of shiny chain, duct tape, a woman's hair clip, and silicone nipples for a baby bottle.

Meanwhile, the FBI in upstate New York were already investigating Gabrion in connection with the theft of social-security benefits belonging to a mentally disabled man from Grand Rapids, Michigan, named Robert Allen. Allen had disappeared in 1995 and was never seen again. Shortly after his disappearance a man who identified himself as Allen—but whom a post-office employee later identified as Gabrion—opened a post office box in Sherman, New York and directed that Allen's benefit check be sent there each month. Gabrion also signed over one of Allen's checks as payment for rent in early 1996. In October 1997, the Detroit FBI got word that Gabrion was headed to Sherman to collect Allen's check for that month. An FBI SWAT team staked out the Sherman post office on October 14. When Gabrion arrived, the agents arrested him. He was carrying a Virginia driver's license in the name of Ronald Lee Strevels at the time.

The body of Timmerman's 11-month old daughter, Shannon Verhage, has never been found. But it is virtually undisputed that Gabrion killed her. While awaiting trial for Rachel's murder, Gabrion gave another prisoner a map of Oxford Lake, on which he had written, "body of 3, 1 found." While incarcerated, Gabrion also told two inmates that he "killed the baby because there was nowhere else to put it."

B.

The government indicted Gabrion for violating 18 U.S.C. § 1111, which prohibits murder "[w]ithin the special maritime and territorial jurisdiction of the United States[.]" The government also notified Gabrion that it would seek the death penalty.

Gabrion went to trial on February 25, 2002. On March 5, the jury found him guilty of first-degree murder. The trial then entered the penalty phase. (That is the phase during which the government and defendant submit evidence as to circumstances of the offense or aspects of the defendant's background that "aggravate" for or "mitigate" against the death penalty.)

A total of 58 witnesses testified in support of the government's allegations during the penalty phase of the trial. Some of the testimony concerned the depraved manner of the murder itself—including the terror that Timmerman must have felt as Gabrion rowed her 100 yards out onto the water, the boat rocking as she lay inside it, blinded, bound, gagged, and weighed down with concrete blocks. Other testimony concerned the likelihood that Gabrion killed Timmerman's baby, Shannon Verhage. Still other testimony concerned Gabrion's character and future dangerousness. Some of that testimony pointed to Gabrion's likely role in the disappearance (and presumably murder) of three other people. One was Wayne Davis, the only witness to Timmerman's rape (other than Gabrion's nephew and Timmerman herself), who was last seen with Gabrion before Davis disappeared, and whose stereo equipment Gabrion tried to sell several weeks later. Another was John Weeks, who was likely the only witness to Timmerman's murder, and who himself disappeared about 18 days later—never to be seen again—after telling his girlfriend that he was going on a "dope run" to Texas with Gabrion. (Gabrion later told Weeks's girlfriend that he had dropped off Weeks with some friends in Arizona.) The third was Robert Allen, the mentally disabled man who crossed Gabrion's path in Grand Rapids and then vanished in 1995, just before Gabrion assumed his identity and began stealing his disability checks.

Numerous other witnesses testified to Gabrion's propensity for violence. Two witnesses described how each of their homes had been set afire shortly after a disagreement with Gabrion. Another witness described how Gabrion began shooting a bolt-action rifle towards his house after he told Gabrion to leave a party there. (The investigating police officer found Gabrion passed out in a trailer with the rifle hanging above him on the wall and spent casings on the hood of his pickup truck outside.) Another witness described how Gabrion trained a rifle on her and her two-year old child as she walked to her car one day, and then climbed into his car and followed them for miles. Another woman testified as to how Gabrion sexually assaulted her in her home. Another witness testified that Gabrion beat and kicked him, punched his wife in the face, and then punched his teenaged son, after the witness interrupted a card game to retrieve heart medicine for the witness's uncle. Another witness testified that Gabrion

said he could "snipe" everyone in the neighborhood from his second-story window. One night this same witness heard a gunshot, looked out the window and saw a red muzzle flash from Gabrion's window just before the crack of a second shot. This witness found a bullet embedded in his home afterwards.

Other testimony showed that Gabrion had been a busy inmate while awaiting trial. He carved a fake gun from soap, painted it black, and planned to use it in an escape attempt. In separate phone calls, he impersonated a state senator and court officials in an attempt to transfer to another jail. He obtained hypodermic needles, razor blades, and a claw made from a metal shower ring, among other contraband. Gabrion also placed dozens of calls to Shannon Verhage's paternal grandmother, accusing her of killing Rachel and Shannon. And Gabrion wrote numerous letters to Rachel's father, saying he knew where the baby was and asking for a photo of her. In desperation, apparently, Rachel's father eventually sent him one, which Gabrion then used for sexual gratification.

After the prosecution finished with its proofs, Gabrion offered mitigation evidence. Dr. Douglas Sharre asserted that Gabrion had been in "multiple motor vehicle accidents" that allegedly damaged Gabrion's brain. Dr. Newton Jackson testified that Gabrion had been subject to "negative influences" as a child, including violence and alcohol abuse by his parents. Dr. Jackson also testified that Gabrion displayed "some histrionic personality features where there is exaggeration and the desire to be the center of attention." (Gabrion testified three times at trial.) Dr. Jackson said "[t]here's also antisocial features where he has a history of arrests and heedless disregard for his own safety and that of others, a lack of empathy for others." Dr. Jackson said that Gabrion also displayed narcissistic features, and that his relationships with other people largely took "the form of using other people to satisfy his own desires." But Dr. Jackson said that "I don't view Mr. Gabrion as mentally ill" and that Gabrion was engaged in "some malingering[,]" *i.e.*, faking his symptoms.

The government presented evidence in rebuttal. It first called the driver in one of Gabrion's alleged car accidents, who testified that Gabrion had faked his injuries.

A neurologist testified that he had reviewed Gabrion's medical records and found no evidence of any brain injury. A clinical neuropsychologist, Dr. Thomas Ryan, offered the same conclusion. Dr. Ryan also tested Gabrion and believed that Gabrion was faking his impairments. He explained the results of one test as follows:

*A*:     [O]n one particular malingering test, which is what we call a forced choice measure, meaning that the person is forced to choose between one of two items, Mr. Gabrion was shown a series of 50 common objects. As soon as that was through, I then showed him another plate of cards, one of which was the item he had just seen, one was one he had never seen. So basically he was forced to choose which one he had just seen. Now, blindly guessing would give you a score of approximately 25 out of 50.

.   .   .

*A*:     And there were three trials with the same exact figures on each trial. That is called the test of memory malingering. On trial one he got a score of 32, and the authors of that test suggest that anything below a score of 45 indicates malingering, particularly on trial two, because this person who developed the test developed it on individuals with very severe injuries, people who have had aneurysms burst, people who've had severe brain injuries, people who have been in coma for three months. So brain-injured individuals generally get a score of about 44 or 45.

*Q*:     Are you saying you gave this test three times?

*A*:     No–yes, I administered–there's three administrations.

*Q*:     What did he get for each test?

*A*:     On trial one he got a score of 32.

*Q*:     What about trial two?

*A*:     On trial two he got a score of 26, so he did worse.

*Q*:     How about trial three?

*A*:     Now, again, these are the same stimulus items, so on trial two he got worse. He performed more poorly. And then on the retention trial he got a score of 21. So this

> indicates to me that he knew the right answer, but was intentionally giving me the wrong answer.
>
> *Q*:     Is that also true–I'm not going to go into the next test, but is that also true of the other tests that you gave him?
>
> *A*:     Yes.

Dr. Gregory Saathoff, a clinical psychologist, likewise testified that Gabrion was malingering. He also said that Gabrion displayed anger towards women.

The jury returned its penalty verdict on March 16, 2002. They found unanimously that the government had proved two statutory aggravating factors beyond a reasonable doubt: first, that Gabrion committed the murder in an especially heinous, cruel, and depraved manner; and second, that he committed the murder after substantial planning and premeditation. In addition, the jury unanimously found four nonstatutory aggravating factors beyond a reasonable doubt: that Gabrion presented a future danger, that Timmerman's death caused a loss to her family and society, that Gabrion caused the death or disappearance of Shannon Verhage, and that Gabrion obstructed justice by murdering Rachel. One or more jurors also found the following mitigating factors by a preponderance of the evidence: that Gabrion had an impoverished and abusive childhood, that he had a lack of parental guidance, that his upbringing contributed to his criminal conduct, that he did not have a record of disciplinary infractions in school, that he engaged in substance abuse, that he had personality disorders, and that the loss of Gabrion's life would be significant to his family. The jury also found that the aggravating factors sufficiently outweighed the mitigating ones to justify a sentence of death. The district court sentenced Gabrion accordingly. *See generally* 18 U.S.C. § 3593(a).

Gabrion appealed. Among other challenges, Gabrion argued (and here we mean that literally—for Gabrion came up with the argument himself) that the federal government lacked jurisdiction over Timmerman's murder. A divided panel of this court rejected this argument in a separate opinion. *See* 517 F.3d 839. Thereafter, the panel addressed Gabrion's remaining claims and unanimously rejected 20 of them.

Over a dissent, however, two members of the panel vacated Gabrion's death sentence on two grounds. *See* 648 F.3d 307. We granted the government's petition to vacate the latter decision and rehear the case en banc.

II.

We begin with the three issues that were the focus of briefing and argument during our rehearing en banc.

A.

Gabrion argues that the murder's location in Michigan—a State that lacks the death penalty—should have counted as a mitigating factor as that term is used under both the Eighth Amendment and the Federal Death Penalty Act. The district court disagreed, and excluded from the penalty phase of Gabrion's trial any evidence or argument to the effect that the murder's location in Michigan was somehow mitigating.

1.

We consider the Eighth Amendment question first. Gabrion's briefs are not clear as to why the murder's location in a non-death penalty state is mitigating, other than to say that it would be "arbitrary" to execute him based upon the "geographic happenstance" that he murdered Rachel Timmerman in a National Forest. Gabrion Br. at 119–20. But it is clear that the murder's location in Michigan is unlike any fact that the Supreme Court has ever recognized as mitigating. It is true, of course, that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). But the question is what counts as "constitutionally relevant mitigating evidence." *Id.*

A capital defendant's "punishment must be tailored to his personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). Accordingly, the two seminal cases that require the admission of mitigation evidence— *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 112

(1982)—are based upon "the principle that punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

It comes as no surprise, therefore, that most of the evidence the Supreme Court has deemed mitigating was evidence relevant to the defendant's personal culpability for his crime. That evidence includes, for example, evidence that the defendant was intoxicated at the time of his crime, *Parker v. Dugger*, 498 U.S. 308, 314 (1991); evidence that the defendant drove the getaway vehicle but did not participate in the murders themselves, *Enmund*, 458 U.S. at 786, 801; evidence of the defendant's "youth" and abusive "family history[,]" *Eddings*, 455 U.S. at 115; evidence of the defendant's low IQ, *Smith v. Texas*, 543 U.S. 37, 44 (2004); evidence that the defendant suffered from depression, *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007); evidence that the defendant suffered from borderline personality disorder, *Bobby v. Van Hook*, 558 U.S. 4, 10–11 (2009); evidence that the defendant was "shuttled from foster home to foster home[,]" *Wiggins v. Smith*, 539 U.S. 510, 525 (2003); and evidence that the defendant was sexually abused as a child, *id.* at 528. The admission of much of this evidence reflects "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Thus, to the extent relevant to the defendant's culpability, mitigation evidence includes evidence about the defendant's background and the circumstances of his crime. *See Penry*, 492 U.S. at 327–28.

In addition to evidence concerning the defendant's culpability, evidence of the defendant's character can be mitigating. That evidence includes evidence that the defendant would be a well-behaved prisoner if not executed, *Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1986); evidence of the defendant's military service, *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009); and evidence of the defendant's religious conversion while in prison, *Wong v. Belmontes*, 558 U.S. 15, 20–21 (2009). Viewed

as a whole, therefore, mitigation evidence encompasses both culpability and character, all to the extent relevant to the defendant's "personal responsibility and moral guilt." *Enmund*, 458 U.S. at 801.  In summary:  mitigation evidence is evidence relevant to "a reasoned moral response to the defendant's background, character, and crime." *Penry*, 492 U.S. at 319 (emphasis omitted); *see also United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000) ("A mitigating factor is a factor arguing against sentencing *this* defendant to death; it is not an argument against the death penalty in general") (emphasis in original).

That Michigan lacks a death penalty has nothing to do with these things.  It has nothing to do with Gabrion's background or character.  It has nothing to do with the reasons why he chose to kill Rachel Timmerman.  It has nothing to do with the utter depravity of the manner in which he killed her.  And above all it has nothing to do with his culpability for that offense or with any other consideration the Supreme Court has ever flagged as mitigating.  Gabrion does not even argue the contrary.

Gabrion does assert that "[t]he simple fact that 227 feet was the difference between a life sentence and a potential death sentence may have been viewed as mitigating by one or more jurors." Gabrion Br. at 120.  But mitigation under the Eighth Amendment is not a matter of geographic coordinates.  That Gabrion would not have been subject to the death penalty if only he had rowed his boat 228 feet to the north, beyond the boundary of the Manistee National Forest, before throwing Rachel Timmerman overboard, is not mitigating—for the same reasons that Michigan's lack of a death penalty is not mitigating.  (See the preceding paragraph.)  Nor does the boundary's proximity become mitigating based on Gabrion's speculation about what a single juror might have thought about it.  Mitigation evidence, as shown above, is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case.  It is true that the Supreme Court has said that mitigation evidence includes evidence that "the sentencer could reasonably find . . . warrants a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quotation marks omitted).  But the key word there is "reasonably"; and read in the

context of the rest of the Supreme Court's mitigation-evidence caselaw, and *Penry* in particular, that passage simply refers to evidence relevant to "a reasoned moral response to the defendant's background, character, and crime." *Penry*, 492 U.S. at 319. Otherwise, for example, the Eighth Amendment would compel admission of evidence regarding the positions of the planets and moons at the time of the defendant's offense—so long as he can show that at least one juror is a firm believer in astrology. To read the *Tennard* passage (and others like it) in the manner that Gabrion suggests would be to transform mitigation from a moral concept to a predictive one, and make a caricature of the law. We decline the suggestion.

The dissent is mistaken, therefore, when it suggests that mitigation, for purposes of the Eighth Amendment, is not a moral concept. Of course it is, as the plain terms of the Supreme Court's precedents make clear. *See, e.g., Penry*, 492 U.S. at 319; *Enmund*, 458 U.S. at 801. But that does not mean (as the dissent seems to fear) that judges must act as moral filters in determining whether evidence is mitigating for purposes of the Eighth Amendment. The Supreme Court has spared us that task, by itself identifying certain categories of evidence—broadly stated, culpability and character—that are morally significant and thus mitigating under the Eighth Amendment. Our task, therefore, is not ourselves to determine the moral significance of a particular fact, but rather to determine whether the fact falls within one of the morally significant bins that the Supreme Court has already identified. The geographic coordinates of Rachel Timmerman's murder fail that test.

The dissent's response is that the location of Timmerman's murder is a "circumstance of the offense." That is true enough—so was the moonphase that day—but the dissent is mistaken to read those words in complete isolation from the Supreme Court's statements as to *why* circumstances of the offense can be mitigating. On this point the Court has been reasonably clear: "it is *precisely because* the punishment should be directly related to the *personal culpability of the defendant* that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry*, 492 U.S.

at 327–28 (emphasis added). And even in *Tennard*—upon which the dissent mistakenly relies here—the Court said that mitigation evidence does not include evidence of "the circumstances of the crime [that] is unlikely to have any tendency to mitigate *the defendant's culpability*." 542 U.S. at 286 (emphasis added).

The dissent's reliance on *Tennard* is misplaced for another reason. There, Tennard sought to admit evidence of his low IQ, which is a type of evidence that the Supreme Court has identified as mitigating. *See Smith v. Texas*, 543 U.S. 37, 44 (2004). The definition of mitigating, therefore, was not the issue in *Tennard*. The issue, rather, was the definition of *relevance*: the Fifth Circuit had upheld the exclusion of Tennard's evidence on grounds that it did not have a strong tendency (as opposed to any tendency, which is the usual relevance standard) to mitigate Tennard's culpability for his crime. The Supreme Court reversed, stating that the Fifth Circuit's test "is inconsistent with the standard we have adopted for relevance in the capital sentencing context." 542 U.S. at 287. So the Court reiterated that standard: "the 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context[.]" *Id.* at 284 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440–41 (1990)). That means the Eighth Amendment requires admission of evidence with "any tendency," not some stronger tendency, "to mitigate the defendant's culpability." 494 U.S. at 286. And here—unlike Tennard's low IQ—Gabrion's decision to throw Rachel Timmerman overboard where he did, rather than 228 feet to the north, had no tendency to mitigate his culpability for that crime.

That Michigan lacks a death penalty is irrelevant to a reasoned moral response to Gabrion's background, character, and crime. Evidence concerning that fact—or any corollary ones—is not mitigation evidence under the Eighth Amendment. *Accord United States v. Higgs*, 353 F.3d 281, 328 (4th Cir. 2003) (federal defendant's ineligibility for death penalty under Maryland law was not mitigating).

2.

The same conclusion holds under the Federal Death Penalty Act.  The Act lists seven types of mitigating factors, plus a catch-all, that the jury "shall consider" in determining whether to recommend a death sentence.  *See* 18 U.S.C. § 3592(a).  Five of the factors measure the defendant's culpability, to wit:  "[i]mpaired capacity[,]" § 3592(a)(1); "unusual and substantial duress," § 3592(a)(2); "the defendant's participation was relatively minor," § 3592(a)(3); "[t]he defendant committed the offense under severe mental or emotional disturbance[,]" § 3592(a)(6); and "[t]he victim consented to the criminal conduct that resulted in the victim's death[,]" § 3592(a)(7).  Another factor asks whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death."  *Id.* § 3592(a)(4).  This factor does not measure the defendant's culpability itself, but instead considers—as a moral data point—whether that same level of culpability, for another participant in the same criminal event, was thought to warrant a sentence of death.  Hence this factor likewise addresses whether the defendant's culpability warrants death.  Another factor concerns the defendant's background:  "The defendant did not have a significant prior history of other criminal conduct."  *Id.* § 3592(a)(5).  The remaining factor is the catch-all:  rather than describe a specific type of mitigation evidence, as the other factors do, this factor simply tracks the Supreme Court's definition of mitigation evidence.  *See id.* § 3592(a)(8) (requiring consideration of "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence").

That Michigan lacks a death penalty does not fall within any of these statutory mitigation factors.  *See Johnson*, 223 F.3d at 675 (§ 3592(a) includes "only factors specific to the defendant").  Gabrion again does not even dispute the point.  But he does contend that the statute's enumeration of mitigating factors is not exclusive.  *See* § 3592(a) (stating that the term "mitigating factors . . . includ[es]" the enumerated factors).  That is true enough;  the statute does not purport to catalogue every conceivable circumstance that might diminish a defendant's culpability or otherwise

mitigate against a sentence of death.  But neither do we have any reason to think that the term "mitigating factors," as used in the statute, encompasses facts having nothing to do with "a reasoned moral response to the defendant's background, character, and crime."  *Penry*, 492 U.S. at 319 (emphasis omitted).  Every indication in the statute is to the contrary:  all of the examples of mitigating evidence listed in § 3592(a) concern the defendant's background, culpability, or crime. The same is true for all 16 examples of aggravating factors set forth in § 3592(c).  That Michigan lacks a death penalty is different in kind from any factor recognized as relevant to sentencing under § 3592(a) or (c).

Whatever the precise contours of the term "mitigating factor" as used in § 3592(a), the murder's location in Michigan falls beyond them.  That one defendant commits a murder on federal land in Michigan is not a mitigating factor—any more than another defendant's commission of a murder on federal land in Ohio (a death-penalty state) is an aggravating one.    Gabrion's statutory argument, like his constitutional one, is meritless.

3.

Gabrion also makes what is known as a "residual doubt" argument.  An element of Gabrion's offense in this case was that he murdered Rachel Timmerman within a National Forest.  *See* 18 U.S.C. § 1111(b).  Whether Gabrion killed Timmerman inside the Forest (as opposed to killing her outside the Forest and then moving her body inside) was an issue extensively litigated during the guilt phase of Gabrion's trial.  The jury eventually found beyond a reasonable doubt that Gabrion killed Timmerman inside the Forest.  Gabrion now says that, under the Eighth Amendment and the Federal Death Penalty Act, he was entitled to argue to the jury during the penalty phase of his trial that they should consider—as a putative mitigating factor—any "residual doubt" about a fact they had already found beyond a reasonable doubt, *i.e.*, that he killed Timmerman inside the Forest.

A plurality of the Supreme Court has said that it is "quite doubtful" that there exists any constitutional right to argue "residual doubt" as a mitigating factor.  *Oregon*

*v. Guzek*, 546 U.S. 517, 525 (2006) (internal quotation marks omitted).  Two other justices have rejected the right's existence altogether.  *See id.* at 528–30 (Scalia, J., concurring).  We are likewise doubtful that a (by-definition) unreasonable doubt regarding an issue litigated during the guilt phase of the trial can be part of "a reasoned *moral* response to the defendant's background, character, and crime."  *Penry*, 492 U.S. at 319 (emphasis in original).

But we need not decide that issue here.  Under the Federal Death Penalty Act, "[t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless . . . where the Government establishes beyond a reasonable doubt that the error was harmless."  18 U.S.C. § 3595(c)(2)(C).  We can make such a determination here, because—unlike in *Davis v. Coyle*, 475 F.3d 761, 774–75 (6th Cir. 2007)—the record contains evidence concerning the factor (*i.e.*, the murder's location) that Gabrion says was improperly excluded from the sentencing phase of his trial.

On this record, the exclusion of Gabrion's residual-doubt argument was so palpably harmless as to render an opinion on the merits of the exclusion nearly advisory.  The government's case for aggravation was overwhelming:  Gabrion killed Timmerman in an undisputedly horrific manner, killed her infant daughter, likely killed three other people who either witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path.  And unlike most residual-doubt cases—where the doubt concerns whether the defendant *actually committed the murder*—here the supposed doubt concerns only a technical jurisdictional issue that, though significant legally, is much less so morally.  The exclusion of Gabrion's residual-doubt argument was harmless beyond a reasonable doubt.

B.

Gabrion next claims that the district court was biased in favor of pro-death penalty jurors during the process of selecting his jury (*i.e.*, voir dire).  During that process, the court interviewed 101 potential jurors (*i.e.*, venirepersons).  Those interviews generally followed the same template:  the court first spoke to the potential juror, explaining that Gabrion was presumed innocent, that the government bore the

burden of proving Gabrion's guilt, and that, if the jury found that the government had not carried its burden, the case was over. Then the court would explain to the potential juror that, if the jury found Gabrion guilty beyond a reasonable doubt, the case would proceed to the sentencing phase, which for practical purposes would be like a new trial. That Gabrion would have been found guilty of premeditated murder was not a sufficient basis for the jury to recommend a death sentence. Instead, the court would explain, the government bore the burden of proving beyond a reasonable doubt any aggravating factors that the government thought favored a death sentence. The court would further explain that Gabrion was entitled to prove, merely by a preponderance of the evidence, any mitigating factors he thought applicable. The jurors would then weigh the aggravating factors against the mitigating ones, and could recommend death only if they found unanimously that the aggravators outweighed the mitigators. At that point in the voir dire, the court would typically ask the venireperson whether she could follow those instructions. Then the prosecution and defense lawyers would each have a turn questioning the potential juror. The court frequently asked its own follow-up questions after the lawyers were done. Once all the questioning was done, the court might excuse the juror on its own initiative, or either side could move to excuse the juror for cause. If a lawyer so moved, the court would hear argument from each side and then sustain or overrule the objection to the juror, explaining the reason for its decision as it did so.

In total, the court excused 25 potential jurors on its own initiative, mostly for reasons of personal hardship. Neither party objected to any of those exclusions. Gabrion challenged a total of 16 jurors for cause, of whom the court excused 11. The government challenged a total of 14 jurors for cause, of whom the court again excused 11. Eventually the venire pool was narrowed to 56 potential jurors. Each side was then permitted to strike 20 potential jurors peremptorily. Gabrion used all 20 of his strikes, removing the five venirepersons he had unsuccessfully challenged for cause, plus 15 other jurors. The government struck 18 potential jurors, including the ones it had unsuccessfully challenged for cause. Neither party objected to any of the 12 jurors who actually sat on Gabrion's jury.

But Gabrion says the process was unfair nonetheless. Specifically, he claims that the district court improperly excluded four generally anti-death penalty venirepersons (Abrahams, Donahey, Hemmeke, and Groves) whom the government challenged for cause. Gabrion also claims that the court's jury-selection process was generally "lopsided" in favor of jurors who supported the death penalty. We consider these claims in turn.

1.

"It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). Gabrion cannot plausibly argue that this right was violated here, since he did not object to a single one of the jurors who sat in his case. But Gabrion does say that a related right was violated, namely, his right to an impartial jury "drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). Gabrion says his venire was tilted this way because of the district court's exclusion of the four venirepersons recited above.

A capital defendant's right to an impartial jury is "balance[d]" against the government's "strong interest in having jurors who are able to apply capital punishment within the framework [the] law prescribes." *Id.* The Supreme Court strikes that balance with the following standard: The court may exclude a juror for cause based upon his views on capital punishment if "the juror's views[,]" either in favor of the death penalty or against, "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted).

We review the district court's application of that standard with considerable deference. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht*, 551 U.S. at 9. (In contrast, the transcript we review captures only the *dire* part

of *voir dire*.)  In many instances, the court's decision whether to exclude a juror also depends on its assessment of the juror's credibility, which lies "peculiarly within a trial judge's province."  *Witt*, 469 U.S. at 428.  We are also mindful of "the expertise developed by trial judges" with respect to the jury-selection process in general.  *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (internal quotation marks omitted). Accordingly, in reviewing the district court's decision whether to exclude a particular juror, "the question is not whether [we] might disagree with the trial court's findings, but whether those findings are fairly supported by the record."  *Witt*, 469 U.S. at 434; *see also Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003) (same).

We begin with the exclusion of venireman Abrahams.  After the district court explained to him the weighing process involved in the sentencing phase of the trial, and asked whether he could follow "the instructions of this Court" in that process, Abrahams replied that "I'm more unsure of if [sic] I could outweigh the sentence of life imprisonment over death or vice versa."  The prosecutor then asked Abrahams whether his "moral values" would "interefere with your determination of what an appropriate sentence would be[.]"  Abrahams replied that "I believe that it's a possibility," adding that "it's just on my mind and it could be something that sidetracks my judgment."  In response to questioning by Gabrion's counsel, however, Abrahams said, "[a]t this point, yes, I do believe that I could" consider whether a death sentence would be appropriate.

The court explored the apparent contradiction between these answers, saying, "I'm sorry, I heard two different things.  I want to see if I can get this straight."  The court then asked Abrahams a leading question in *favor* of finding him qualified:

> *Q*:     And could you then impose either sentence if you felt
>          the government had prevailed beyond a reasonable doubt
>          with aggravating circumstances?

But Abraham's answer cut in favor of exclusion:

> *A*:     It's – I'm not sure.  That's what I'm trying to express,
>          that I don't know for sure that I could go through the
>          whole trial and, for instance, them prove him guilty and
>          then go through the second part of the trial for

sentencing, that I could say life imprisonment or death. I honestly don't know. That's the point that I was trying to get across. Very unsure of what I could say yes or no to, either way.

The court then excused Abrahams for cause, reasoning:

[N]ormally I would say if he says I'll consider both of them, that's normally all right. But if it's preceded with I don't know if I could do it and then I ask him, Could you, and he says, I don't know, I think it's grounds for excusal. It's a close question, but I think it's grounds for excusal because of his hesitancy and the honesty with which he's approached it.

Thus, the court itself sought to rehabilitate Abrahams after he gave conflicting answers regarding his ability to follow the court's instructions. But Abrahams resisted the rehabilitation. The court was within its discretion to exclude him.

Venireman Donahey likewise resisted efforts at his rehabilitation. Donahey stated on his jury questionnaire that "I think the death penalty is wrong[,]" but then told the court that he "would follow what the law would tell me to do on that." In response to an open-ended question by the prosecutor, however, Donahey said: "And to take life because they took someone else's life, you know, somewhere down inside me, it just doesn't seem right[.]" He added, in response to a leading question from the prosecutor, that his views about the death penalty "might" interfere with his "ability to make a judgment as to sentencing[.]" Gabrion's counsel then sought to rehabilitate Donahey with a long explanation of the sentencing process, after which came the following exchange:

*Q*:     Now, given this, would you be able to consider all of these factors in making a determination of sentence, aggravating factors, mitigating factors, bring your own values, and consider the imposition of one of these two sentences?

*A*:     I believe it would be very difficult. I would hope that I could, you know. But until I'm actually in that position, it's very difficult to say.

*Q*:    Well, we understand it's difficult.  We understand it's –

*A*:    Well, you want a yes or no question to something –

*Q*:    No, no.  Can you consider it is the question.

*A*:    Yes, I could consider it.

*Q*:    I have no further questions at the moment.

The district court excused Donahey for cause, explaining:

*Q*:    Well, he said he didn't know [whether he could consider the death penalty], he didn't know to one of the questions he asked, and I think he should be excused. Number one, he indicates he has a strong moral view against the death penalty; and number two, when asked, he equivocated on whether or not he could in fact consider it.  He would try hard, but he was unable to say that he would be able to do it.  So I think he needs to be – he should be excused for that reason in this matter.

Donahey's exclusion presents a closer question than Abrahams's did.  The first reason cited by the court—that "he indicates he has a strong moral view against the death penalty"—is not a ground for exclusion.  *Witt*, 469 U.S. at 424.  But the court did not rely on that reason alone, finding that Donahey "equivocated" as to whether he could consider the death penalty.  That finding is plainly correct.  The court's final reason—that Donahey "was unable to say that he would be able to" consider the death penalty—is at least nominally refuted by Donahey's answer that he "could consider it." But that answer came in response to a leading question, after Gabrion's counsel had pressed him on the point; and the answer came on the heels of another equivocation—that it "would be very difficult" to consider a death sentence. Donahey's statements, viewed as a whole, were ambiguous; and "when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly is by its assessment of the venireman's demeanor, is entitled to resolve it in favor of the" government.  *Uttecht*, 551 U.S. at 7 (internal quotation marks and alterations omitted).  The court was within its discretion to exclude Donahey.

Venireman Hemmeke expressed stronger opposition to the death penalty than Donahey did, checking a box on the juror questionnaire that said, "I could never, regardless of the facts and circumstances, return a verdict which imposed the death penalty." But his answers as a whole were incoherent. The court began the questioning as follows:

*Q*:    Okay. What did you mean by that [response on the questionnaire]?

*A*:    I feel that if he is guilty, that it's more punishing to have
        him stay in jail in a – cooped up in a little cell than what
        it would be to be put to death.

*Q*:    Oh. You think, then, that it's more cruel –

*A*:    To keep them –

*Q*:    – to sentence to life in prison than it is to take life?

*A*:    Yes.

*Q*:    That's why you would have difficulty imposing death?

*A*:    Yes.

The court then asked Hemmeke whether he could follow the court's instructions "on aggravating and mitigating circumstances and weighing those circumstances[.]" Hemmeke responded:

*A*:    I – hearing what they might say, I might change it. But
        I'm pretty set in the no death penalty.

*Q*:    Wait a minute. No death penalty because that's lenient
        and life in prison is worse, right?

*A*:    Yeah, yeah.

In response to questioning by the prosecutor, however, Hemmeke said: "If the facts are there, everything fits together, and it was a very gruesome, ugly murder, then I would maybe do it, maybe go with the death sentence." Hemmeke also said—in response to a leading question from defense counsel—that "yeah[,]" he could consider a death sentence.

The court struck Hemmeke for cause, saying "I'm terribly upset by this man's fuzzy thinking in which he thinks somehow that life in prison is more egregious than death[.]"  The court added that "I'm not satisfied that this gentleman's thought process can hang together for purposes of making the decision it needs to"; that "[m]y reason for excusing him is really I don't think he can follow instructions"; and that "I ultimately think that the defendant may be prejudiced by him."  We have no basis to second-guess any of these findings.

That leaves the exclusion of venireman Groves, who was the "water resources director" for a local employer.  The prosecution had actually contacted Groves about Gabrion's case well before voir dire, asking him about the meaning of the term "navigable waters" under Michigan law.  Groves said during voir dire that he could set that contact aside if necessary, but that he also had "a co-worker whose wife apparently went to school with [Gabrion], and I've been told things about [Gabrion]."  Groves described those things as "very unflattering[.]"  When asked by the court whether he would "be able to set that aside in this case[,]" Groves answered, "I'd like to think I could."  Groves also said that "I think I would reserve the death penalty for an individual like Osama bin Laden where we have someone that's a mass murderer type."  When later asked by defense counsel whether he could follow the court's instructions in a sentencing phase, Groves answered:  "I suppose I could, yes."

The court excluded Groves for three reasons:  "The first is he was apparently contacted by the government . . . and I think that just raises a specter here that I think is inappropriate."  Even more troubling for the court, however, was a second reason:

> I think this is really potentially very damning of Mr. Gabrion, he apparently talks to somebody he works with whose wife apparently went to school with Mr. Gabrion and she fills his ear with things about Mr. Gabrion.  And I say, can you disregard that?  And he looks at me and he says, Yeah, I think I can.  I'm not convinced he's very sincere.

Third, the court said that "when very artfully led though a serious of questions, he says, yeah, I could consider" the death penalty, but that Groves "winc[ed] and bob[bed] and

weave[d] a little bit" when he said that. Each of these reasons was sufficient for Groves's exclusion.

2.

Gabrion is unclear about the constitutional basis for his claim that the district court's jury-selection process was generally "lopsided" in favor of pro-death penalty jurors. He says in passing that this claim is based upon the Equal Protection and Due Process clauses, but does not develop that argument enough for us to consider it here. Nor is it clear from the caselaw that the Sixth Amendment supports a jury-selection claim that is not based on either the exclusion of a particular anti-death penalty juror or the inclusion (on the actual petit jury) of an "automatic death penalty" juror. *See Morgan v. Illinois,* 504 U.S. 719, 728 (1992). But we will assume without deciding that Gabrion can show a violation of the Sixth Amendment if he simply demonstrates that his jury selection process favored pro-death penalty jurors generally.

The factual basis for Gabrion's claim, such as it is, is twofold. First, he says that "the trial court attempted to rehabilitate potential defense cause excusals [*i.e.*, pro-death penalty jurors], but did not take the same approach to potential government cause excusals [*i.e.*, anti-death penalty ones]." Gabrion Suppl. Br. at 14. The record belies that assertion. Take the example of venireperson Branch, who stated on his questionnaire that he was "really against the death penalty." In response to another question—whether there was "anything about this case that would prevent" him from following his oath if selected as a juror—Branch responded, yes: "The death penalty." But the district court did not leave matters there and excuse Branch for cause. Instead, the court explained the trial process to Branch at length and then asked whether, as a part of that process, Branch could consider the death penalty. Branch said that he could. But Branch then backtracked in response to the prosecutor's questions, saying that he was "not certain" whether he could consider the death penalty. So the court rehabilitated him again:

> *Q*:    . . . I want to make sure that you're on the page here.
>         The predicate here was if the facts warranted it, in other

> words, if the facts were such that would warrant that, could you? And I heard you say I might not. What did you mean by that?
>
> . . .
>
> *A*:    It's hard to say without me being a juror or in the circumstances where I have to decide. I might say it's a possibility of a yes or a no.
>
> *Q*:    Right. And that's based—I want to make sure—that's *based upon the facts*, not on what your philosophy is?
>
> *A*:    Religion or nothing, no, just the facts.
>
> *Q*:    Okay. Thank you, sir. Thank you.

The government then moved to excuse Branch for cause. The court refused, explaining: "this witness says it depends on the facts, and I think that's sufficient. I'm troubled by the fact that he previously stated, No way. But he obviously has done some thinking about this, and I think he's appropriate."

Likewise, there were two other anti-death penalty veniremen—Wing and Fix—who at first equivocated regarding their ability to consider the death penalty, but then gave rehabilitative answers to follow-up questions from the court. Indeed, Gabrion's counsel cited Fix's "response to your [*i.e.*, the district court's] question" in opposing the government's motion to excuse Fix for cause. The court "agree[d]" with Gabrion's counsel on that point, and overruled the government's objections to both Fix and Wing. Moreover, as noted above, the court asked venireman Abrahams a leading question in favor of rehabilitation, but Abrahams declined to follow the court's lead. Thus, Gabrion's assertion that the court rehabilitated only pro-death penalty venirepersons is simply false.

Gabrion also says the district court was biased because it excluded four generally anti-death penalty venirepersons (Abrahams, Donahey, Hemmeke, and Groves, already discussed above) while retaining three generally pro-death penalty ones (Harrington, Wehler, and Erickson) whom Gabrion challenged for cause (and later struck peremptorily). It is true, of course, that the court excluded the one set of

venirepersons while retaining the other. But the argument's premise is wrong. Jurors are not commodities. They are individuals, whose answers during voir dire differ in various ways, some subtle and some not. Here, the district court took account of those differences and excluded Abrahams, Donahey, Hemmeke, and Groves for the reasons already mentioned. And it retained pro-death penalty jurors Harrington, Wehler, and Erickson on grounds similar to the grounds on which it retained anti-death penalty jurors Branch, Fix, and Wing—namely, that on balance each of them credibly stated that he could follow the court's instructions in choosing a sentence in the case. *See, e.g.*, 2 Jury Trial Tr. at 335 (stating that Branch "is, in my opinion, a flip of the Wehler guy"); *Id.* at 536 (stating that Harrington "is not unlike this morning's Mr. [] Branch who said he could never impose the death penalty . . . and come to find out, he said he could be fair").

The district court did a commendable job, not an unconstitutional one, of selecting a jury in this case. Gabrion's arguments to the contrary are meritless.

## C.

Gabrion next argues that the district court gave the jury erroneous instructions with regard to the findings necessary to its recommendation that the court sentence Gabrion to death. In order for Gabrion to be eligible for the death penalty, the jury had to find two things beyond a reasonable doubt: first, that Gabrion killed Rachel Timmerman "intentionally[,]" 18 U.S.C. § 3591(a)(2)(A); and second, that the government proved "at least one of the statutory aggravating factors set forth at § 3592." *Jones v. United States*, 527 U.S. 373, 376–77 (1999). "Once [Gabrion] became death eligible, the jury had to decide whether he should receive a death sentence." *Id.* at 377. Specifically, the jury was required to

> consider whether all the aggravating factor or factors found to exist
> sufficiently outweigh all the mitigating factor or factors found to exist
> to justify a sentence of death . . . . Based upon this consideration, the
> jury by unanimous vote . . . shall recommend whether the defendant
> should be sentenced to death[.]

18 U.S.C. § 3593(e).  If the jury recommends death, the district court is required to impose that sentence.  *See* 18 U.S.C. § 3591(a)(2).

Here, the jury found beyond a reasonable doubt that Gabrion killed Timmerman intentionally and that two statutory aggravating factors were present.  The jury also determined, unanimously, that the government's aggravating factors sufficiently outweighed the mitigating ones to justify a sentence of death.  But Gabrion argues that the jury was required to make the latter determination—*i.e.*, the "outweighs" one—beyond a reasonable doubt.  The district court did not instruct the jury to that effect, so Gabrion says we must vacate his sentence.

As support for his argument, Gabrion cites the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 489 (2000).  There, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id*. at 490.  Gabrion says that the jury's "outweighs" determination is a "fact" that increases his maximum sentence from life to death, and thus must be proved beyond a reasonable doubt.

The problem with this argument is that *Apprendi* does not apply to every "determination" that increases a defendant's maximum sentence.  Instead it applies only to findings of "fact" that have that effect.  *Id*.  In *Apprendi* itself, for example, the Court held that a jury was required to find beyond a reasonable doubt that the "defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race[.]"  *Id.* at 468–69.  In *Blakely v. Washington*, 542 U.S. 296, 300 (2004), the same was true about a finding that the defendant acted with "deliberate cruelty[.]"  In *United States v. Booker*, 543 U.S. 220, 233, 235 (2005), the same was true about a finding that the defendant possessed more than 500 grams of crack.  Even in *United States v. Gaudin*, 515 U.S. 506, 509 (1995)—a case often cited as the high-water mark for what counts as a "fact" for purposes of *Apprendi*—the necessary finding was simply that the defendant's statement was likely to have a particular effect on its recipient.

These sorts of findings—that a particular statement might influence its recipient, or that the defendant acted with a particular state of mind, or possessed a particular quantity of drugs, or was himself the triggerman, rather than just an accomplice—are different in kind from the "outweighs" determination required by § 3593(e). *Apprendi* findings are binary—whether a particular fact existed or not. Section 3593(e), in contrast, requires the jury to "consider" whether one type of "factor" "sufficiently outweigh[s]" another so as to "justify" a particular sentence. Those terms—consider, justify, outweigh—reflect a process of assigning weights to competing interests, and then determining, based upon some criterion, which of those interests predominates. The result is one of judgment, of shades of gray; like saying that Beethoven was a better composer than Brahms. Here, the judgment is moral—for the root of "justify" is "just." What § 3593(e) requires, therefore, is not a finding of fact, but a moral judgment.

In that respect § 3593(e) is no different from 18 U.S.C. § 3553, which likewise requires the decisionmaker to "consider" various "factors" and then determine—as a prerequisite to imposing a particular sentence—that the sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in § 3553(a)(2). That determination is just as necessary to the selection of a sentence under § 3553(a) as the "outweighs" determination is to the selection of a sentence under § 3593(e). The two determinations are therefore indistinguishable for purposes of *Apprendi*; and yet no one contends that a jury must find beyond a reasonable doubt that a particular sentence is "sufficient, but not greater than necessary" under § 3553(a)(2).

What § 3593(e) requires, in summary, is not a finding of fact in support of a particular sentence. What § 3593(e) requires is a determination of *the sentence itself*, within a range for which the defendant is already eligible. That makes this case different from any in which the Supreme Court has applied *Apprendi*. Here, Gabrion was already "death eligible" once the jury found beyond a reasonable doubt that he intentionally killed Rachel Timmerman and that two statutory aggravating factors were present. *Jones*, 527 U.S. at 377. At that point the jury did not need to find any additional facts in order to recommend that Gabrion be sentenced to death. It only

needed to decide, pursuant to the weighing of factors described in the statute, that such a sentence was "just[]."  18 U.S.C. §§ 3591(a), 3593(e).  And in making that moral judgment, the jury did not need to be instructed as if it were making a finding of fact.

Every circuit to have addressed the argument that Gabrion makes here—six circuits so far—has rejected it.  *See United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007); *Purkey*, 428 F.3d at 749.  Today we become the seventh.  Gabrion's argument is meritless.

## III.

## A.

Gabrion also presents three arguments that he says the original panel in his appeal overlooked.

## 1.

Gabrion's first such argument is that we should order a determination of his competency for purposes of his appeal.  By way of background, the district court appointed no fewer than three mental-health experts to examine Gabrion, each of whom concluded that he was both competent and malingering.  (To malinger is to manipulate; and persons with Histrionic or Antisocial personalties tend to be highly manipulative. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 713 (4th ed. 2000); *see also id.* at 702 (Antisocials "may repeatedly lie, use an alias, con others, or malinger").) We agree with the original panel that the district court was correct to find that Gabrion was competent to stand trial. *See* 648 F.3d at 318–20.  And Gabrion's argument that we should order a new determination of his competency for purposes of his appeal is, in substance, simply a rehash of his argument that he was incompetent in the district court. Overlooked or not, this argument is meritless.

2.

Gabrion says the original panel also overlooked his argument that the district court should not have excluded him from the courtroom during a portion of the trial's penalty phase. The exclusion in question occurred after Gabrion punched his lawyer in the face in the presence of the jury. The district court sent Gabrion upstairs to the courthouse lockup, where for the remainder of that afternoon he watched the trial on closed-circuit television. The next morning the U.S. Marshal reported that Gabrion had been "very unruly in the cell block throughout the afternoon, banging on the cell, yelling, that sort of behavior all afternoon[.]" Gabrion's counsel reported the same thing. The court left Gabrion upstairs for a total of 24 witnesses.

The Confrontation Clause and Federal Rule of Criminal Procedure 43 ordinarily require a district court to warn a disruptive defendant before removing him from the courtroom. *See Gray v. Moore*, 520 F.3d 616, 624 (6th Cir. 2008); Fed. R. Crim. P. 43(c)(1)(C). Here, Gabrion got plenty of warning. For example, Gabrion repeatedly interrupted the court during a hearing three days before trial. The court warned him: "Mr. Gabrion, I will remove you and I will penalize you if you continue to interrupt me or anyone else during this trial very specifically. I mean that. Do you understand that?" The court later added, "I'm giving you fair warning and I want you to hear me very clearly. I will not tolerate interruptions or noise during the trial." So lack of warning is not an issue here.

Gabrion contends, however, that the court should have returned Gabrion to the courtroom sooner than the court actually did. Specifically, Gabrion suggests that the court should have put him in shackles and returned him to the courtroom almost immediately after the punch, albeit with a stern warning, apparently, that additional outbursts would lead to his removal. The argument defies common sense. Setting aside the whole question whether Gabrion could have been physically restrained, the court had every reason to think that Gabrion would continue to be *verbally* disruptive if he were promptly to return. And Gabrion admits that a district court can exclude a defendant who is verbally disruptive. *See* Gabrion Pet'n for Reh'g at 3.

Gabrion was verbally disruptive throughout almost the entire trial. To cite one of dozens of examples, during the prosecution's opening statement during the penalty phase, Gabrion interjected for all to hear: "Why do you just let him stand up there and lie like that and never do anything about it? It's bullshit. . . . Fucking liar asshole.*"* The court had no reason to think Gabrion would behave any better just after punching his counsel and carrying on upstairs all afternoon. The district court did not abuse its discretion by excluding Gabrion for the period it did. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) ("trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case").

3.

Finally, Gabrion says the original panel overlooked his argument that Dr. Saathoff's testimony in rebuttal violated Gabrion's Fifth and Sixth Amendment rights to the extent that Dr. Saathoff testified about Gabrion's contempt for women. We do not think the panel overlooked this argument. Gabrion concedes that Dr. Saathoff could testify about subjects raised by Gabrion's experts in mitigation. *See* Gabrion 2009 Suppl. Br. at 38–39. But Gabrion asserts that Dr. Saathoff's testimony about Gabrion's misogyny exceeded the scope of his experts' testimony in mitigation, thereby allegedly violating Gabrion's rights under the Fifth and Sixth Amendments.

The original panel correctly determined that the factual premise of this argument is incorrect: "Dr. Saathoff's testimony as a whole was a fair rebuttal of Gabrion's mitigation evidence and did not unfairly prejudice Gabrion." 648 F.3d at 341. For example, Dr. Jackson—one of Gabrion's experts—testified at length about "Gabrion's psychological makeup[,]" an open-ended subject of which Gabrion's misogyny was certainly a part. Gabrion's mitigation evidence also downplayed the extent of his future dangerousness to women. *See Id.* Thus, whatever the contours of the Fifth and Sixth Amendment rights that Gabrion asserts here, Dr. Saathoff's testimony did not violate them—for reasons already stated in the original panel opinion.

B.

Gabrion also presents more than a dozen other arguments that the original panel unanimously rejected.  *See, e.g.*, Gabrion Br. at 78 (the district court abused its discretion "by removing a juror who was allegedly sleeping").  We have  reviewed those arguments, but do not think it worthwhile to address them again here.  It is enough for our purposes to state that we reject all of Gabrion's remaining arguments.

*        *        *

After 11 days of testimony and two days of careful deliberation, the 12 jurors who sat on this case decided unanimously that Marvin Gabrion deserved a sentence of death for what he did to Rachel Timmerman.  We have no basis to set aside that moral judgment.  The district court's judgment is affirmed.

---

**CONCURRENCE IN THE JUDGMENT**

---

CLAY, Circuit Judge, concurring only in the judgment. Both the majority and the dissent offer wide-ranging opinions that delve into the minute detail of the important issues implicated by this case. It is the breadth of those opinions, however, that prevents me from fully embracing either opinion's analysis. Therefore, I concur only in the judgment of the majority.

The central concern throughout the appeal of this case has had to do with the location of Rachel Timmerman's murder, just 227 feet inside the boundaries of the Manistee National Forest in western Michigan. During the penalty phase of his trial, Defendant sought to raise two arguments with respect to the location of the murder. First, he sought to argue that because the murder occurred on federal property in Michigan, a non-death penalty state, the jury should be able to consider as a mitigation factor that had the murder occurred on non-federal property in Michigan, he would not be eligible to receive the death penalty. Second, Defendant contends that he should have been able to make a so-called residual doubt argument that despite the jury's finding beyond a reasonable doubt at trial that the murder was committed on federal property, it may actually not have been committed on federal property. The issue for us as an appellate court is to decide whether the district court erred in excluding such arguments from the penalty phase.

Any attempts to recast the issue more broadly would seem to be inappropriate and ill-conceived. Specifically, I am sympathetic to the dissent's suggestion that the majority has altered the standard for what constitutes relevant mitigating evidence. *See* Dissent at 40. While I do not see the majority's alteration as the "transform[ation]" that the dissent does, *id.*, I do not think that the majority's references to the jury's moral judgment are necessary to resolve this case. *See* Maj. Op. at 12–15. To be sure, morality and the jury's "moral response" are part of death penalty deliberations, *Penry v. Lynuagh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v.*

*Virginia*, 536 U.S. 304 (2002)*,* but, as demonstrated below, I think this case can be more narrowly resolved by deciding whether either of Defendant's arguments fit into the categories of "culpability and character" that the Supreme Court has identified to be relevantly considered by a jury in imposing the death penalty. *See* Maj. Op. at 13.

As to Michigan's status as a non-death penalty state, such an argument seeks to inject extraneous factors into the jury's consideration of Defendant's sentence. While the jury, especially in capital cases, is entitled to "take[] a wide range of factors into account," *Lockett v. Ohio*, 438 U.S. 586, 602 (1978), jurors must be guided in their "individualized assessment of the appropriateness of the death penalty" to a given defendant, *Penry*, 492 U.S. at 319; *see also Gregg v. Georgia*, 428 U.S. 153, 192–93 (1976) ("The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition."). An argument about Michigan's decision, as a state, not to impose the death penalty has nothing to do with a federal jury's determination of the appropriateness of applying the federal death penalty statute with respect to Defendant. The district court's refusal to allow such an argument during the penalty phase of the trial does not appear to constitute error.

With respect to the residual doubt argument, it must first be stated that the same jury had already found beyond a reasonable doubt that Defendant murdered Timmerman on federal property when it found Defendant guilty during the guilt phase of the trial. This finding, as demonstrated by the concurrence in *Gabrion I*, was well-supported by the evidence. *United States v. Gabrion*, 517 F.3d 839, 82–74 (6th Cir. 2008) (Moore, J., concurring in the judgment). This case does not require us to answer the question whether it would have been error had the district court allowed a residual doubt argument on the issue of the location of the murder to be presented during the penalty phase of the trial; and I decline to address that issue. We need only decide whether the district court's refusal to allow such an argument was error under the circumstances of this case. In this case, the issue of the location of Timmerman's murder had already been decided definitively and unassailably by the same jury. Notwithstanding the wide berth that the Supreme Court has traditionally given

defendants seeking to introduce mitigation evidence during the penalty phase of a death penalty trial, *see, e.g.*, *Tennard v. Dretke*, 542 U.S. 274 (2004); *Lockett*, 438 U.S. 586, the district court was within its discretion under the facts of this case not to permit re-argument on this point during the penalty-phase, *cf. Oregon v. Guzek*, 546 U.S. 517, 526 (2006); *Lockhart v. McCree*, 476 U.S. 162, 205 (1986) (Marshall, J., dissenting).

In sum, Defendant has come forward with no assignments of error, including his arguments with respect to the *voir dire*, which suggest that the district court's handling of this case was improper so as to mandate reversal. Therefore, I concur in the judgment that Defendant's conviction and sentence be affirmed, but not in the majority opinion or its analysis.

––––––––––––––––––––

**DISSENT**

––––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge, dissenting.  During the guilt phase of Marvin Gabrion's trial, the jury was required to make a determination on an extremely complicated and hotly contested element of the offense—whether Gabrion committed the murder in the Manistee National Forest or in the State of Michigan. Their answer not only resolved an interesting academic issue of federal jurisdiction, but also exposed Gabrion to a sentence of death.  Given the direct connection between this determination and the resultant penalty phase, Gabrion sought to introduce as mitigation both a residual-doubt argument and evidence of the location of the crime.  The district court denied this request, and the penalty phase proceeded with no mention of this circumstance of the offense.  At the end of the penalty phase, Gabrion sought to have the jury instructed in accordance with *Apprendi v. New Jersey*, 530 U.S. 466 (2000)—that in order to sentence Gabrion to death, the jury would have to find beyond a reasonable doubt that the aggravators outweighed the mitigators.  The district court denied this request as well.

The majority concludes that neither of these determinations constituted errors. Because I believe that the district court erred in making each of these determinations, as well as in excluding certain jurors during voir dire, and that Gabrion's constitutional rights were violated as a result, I cannot agree.  I would vacate Gabrion's sentence and remand for a new penalty hearing.  I therefore respectfully dissent.

## I.  PENALTY-PHASE ERRORS

### A.  Michigan's Lack of a Death Penalty as Mitigating Evidence

Gabrion articulates three theories in support of his contention that the district court erred by precluding him from presenting evidence of the location of the crime during the penalty phase of his trial, one arising under the Eighth Amendment and two based on the Federal Death Penalty Act ("FDPA").  Although I believe that each of

these theories requires admission of this evidence, I am most troubled by the majority's decision to eviscerate the decades-old relevance standard established by the Supreme Court in order to achieve the majority's desired result.

Replacing constitutionality with morality as the benchmark of relevance narrows the scope of evidence that a defendant may present as mitigation during the penalty phase of his trial. Given the importance of this constitutional right, I cannot support transforming the standard in such a way that precludes a defendant from presenting constitutionally relevant evidence simply because a panel of judges cannot see its moral relevance. Whatever the majority thinks of Gabrion's moral culpability or the horrific nature of the crimes he committed, these opinions cannot displace the constitutional relevance of the evidence Gabrion seeks to present. I would allow Gabrion to present evidence of the location of the crime—an element of the offense—based on the constitutional standard employed by the Supreme Court, and alternatively, under the FDPA.

### 1. Eighth Amendment

A defendant has an Eighth Amendment right to present all evidence at the penalty phase of a capital trial that is relevant to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The Supreme Court has made clear that this is an expansive right:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . , we spoke in the most expansive terms. We established that the meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies.

*Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (internal quotation marks omitted).

Rather than apply the Supreme Court's conception of relevance, the majority fashions its own standard—"mitigation evidence encompasses both culpability and character, all to the extent relevant to the defendant's personal responsibility and moral guilt."[1]  Maj. Op. at 13 (internal quotation marks omitted).  However, this standard addresses only a part of what would be admissible under the relevance standard outlined by the Supreme Court.  Critically, this new standard allows the majority to avoid engaging in any analysis concerning whether the evidence Gabrion seeks to present is a circumstance of the offense, a consideration included expressly in the Supreme Court's relevance standard.  *See Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("We have long recognized that for the determination of sentences, justice generally requires that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") (internal quotation marks and alterations omitted).  That the evidence at issue here was an element of the offense only underscores the consequences of the majority's decision to transform the standard.  Under the Supreme Court's standard, evidence related to an element of the offense is unequivocally relevant, yet under the novel standard employed by the majority, a court may skirt the inquiry most relevant to its admission.

Additionally, the Supreme Court has indicated that evidence may "ha[ve] nothing to do with his culpability for [the] offense," yet be admissible nonetheless.  Maj. Op. at 13.  As explained by Justice Stevens, "a jury must be allowed to give weight to any aspect of a defendant's character or history that may provide a basis for a sentence other than death, even if such evidence does not tend to reduce the defendant's culpability for his crime."  *Wong v. Belmontes*, 558 U.S. 15, 28 (2009) (Stevens, J., concurring) (internal quotation marks omitted); *see also Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (acknowledging that mitigation includes more than that which addresses culpability:  "we have long recognized that a sentencing jury must be able to give a reasoned moral response to a defendant's mitigating evidence—particularly that evidence which tends to diminish his culpability") (internal

---

[1] The majority references the correct standard at one point in its opinion, yet bases its analysis wholly on the moral-culpability and character-of-the-defendant factors.

quotation marks omitted).  The fact that "most of the evidence the Supreme Court has deemed mitigating was evidence relevant to the defendant's personal culpability for his crime" does not eliminate the broad constitutional protections for those defendants who wish to present evidence unrelated to their moral culpability.  Maj. Op. at 12.

Notably, the majority opinion is devoid of any examples of the Supreme Court having excluded mitigation evidence on the basis that it did not meet the constitutional minimum, let alone any evidence similar to that which Gabrion seeks to introduce.[2] Instead, the cases cited by the majority reflect the inclusive nature of the Eighth Amendment standard.  A review of post-*Furman* cases that consider mitigation evidence reveals that the Supreme Court consistently employs iterations of the expansive relevance standard.  *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 248 (2007) ("In those cases, we emphasized the severity of imposing a death sentence and that the sentencer in capital cases must be permitted to consider *any* relevant mitigating factor.") (internal quotation marks omitted); *Tennard*, 542 U.S. at 285 (explaining that a jurisdiction "cannot bar the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death") (internal quotation marks and alteration omitted); *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances."); *Lockett*, 438 U.S. at 604 ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the

---

[2]The Seventh Circuit's opinion in *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000), is not instructive.  Gabrion did not seek to introduce evidence that the death penalty is immoral.  He sought to introduce evidence relating to an element of the offense of which he was convicted.  In other words, Gabrion sought to proffer evidence supporting an argument "against sentencing *this* defendant to death." *Id.* at 675.  Additionally, insofar as the majority assumes Gabrion's evidence can be presented only in generalities, the Supreme Court has explained that although "[i]t might seem, then, that [certain types of evidence] apply to every eligible defendant[,] . . . that cannot be correct." *Jones v. United States*, 527 U.S. 373, 401 (1999).  As applied to the context of victim-impact statements, the Supreme Court stated that "[e]ven though the *concepts* of victim impact and victim vulnerability may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular case is inherently individualized." *Id.* The same is true of the evidence Gabrion sought to present relating to the location of the offense.

defendant proffers as a basis for a sentence less than death.") (internal footnote omitted).**3**

The Supreme Court has continued to apply such an expansive standard with good reason. Without an opportunity to present mitigation evidence—the means by which the jury considers the individual defendant and the circumstances of his offense—the death penalty would be unconstitutional. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a *constitutionally indispensable* part of the process of inflicting the penalty of death.") (citation omitted) (emphasis added); *see also Kansas v. Marsh*, 548 U.S. 163, 171 (2006) ("This Court noted that, as a requirement of individualized sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation.").**4**

---

**3**The majority's citations to cases that discuss the moral culpability of the defendant are unpersuasive. As an initial matter, it is unsurprising that the Supreme Court has made statements regarding the significance of moral culpability in mitigation; it is, after all, one of the categories that the Supreme Court itself has outlined. What the majority here continues to disregard, however, is that "circumstances of the offense" is also a category incorporated by the Supreme Court. In fact, *Penry v. Lynaugh*, 492 U.S. 302 (1989), a case cited by the majority, expressly includes this category: "[T]he Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense." *Id.* at 317 (internal quotation marks omitted).

Moreover, I must point out that the majority's reliance on *Tennard* and *Enmund v. Florida*, 458 U.S. 782 (1982), for the proposition that mitigation is only a moral concept is misplaced. In *Enmund*, the Supreme Court discussed the personal culpability of the defendant in the context of the imposition of the death penalty on a non-triggerman, not as a general matter. 458 U.S. at 797–801. With respect to *Tennard*, the majority omits the surrounding text of the sentence that it quotes. When read in context, the paragraph clearly establishes the inclusive nature of the mitigation standard. It does not prohibit admission of the circumstances of the crime, as the majority's selective quotation insinuates. The entirety of the cited paragraph states as follows:

> We have never denied that gravity has a place in the relevance analysis, insofar as evidence of *a trivial feature* of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. However, to say that only those features and circumstances that a panel of federal appellate judges deems to be severe (let alone uniquely severe) could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death.

*Tennard*, 542 U.S. at 286–87 (internal quotation marks and citations omitted) (emphasis added).

**4**The result of the majority's analysis is to exclude from the penalty phase evidence that was presented during the guilt phase. However, the bifurcated nature of a capital trial was not established in order to restrict the jury's consideration of evidence related to the circumstances of the offense. Rather, it was created in order to enable the jury to consider more information about the defendant than that which

Under the correct standard, the evidence that Gabrion sought to introduce is unquestionably relevant. When the location of the crime is what makes a defendant eligible for the death penalty in the first place, the location becomes a "circumstance of the offense" that could justify a sentence less than death. Indeed, in this case, the location of the body was an *element* of the offense.[5] A juror may have been less inclined to impose the death penalty for a crime committed in Michigan if he knew that the United States's ability to prosecute the crime and impose a sentence of death was determined by a distance roughly the length of a hockey rink. Certainly, not every juror would be softened by the knowledge that Michigan is a non-death-penalty state and that Gabrion was eligible for the death penalty only because his crime was committed on federal lands within Michigan—a conclusion that itself was extremely complicated and hotly contested. But the fact that some jurors reasonably may be inclined not to impose the death penalty as a result of such information makes the excluded information mitigating.

Moreover, the Supreme Court has rebuked attempts by the courts to narrow the scope of mitigating evidence, making clear that it is not a judge's role to weigh in on the moral relevance of evidence. In *Tennard*, for example, the Supreme Court rejected the Fifth Circuit's constitutional-relevance screening test and its nexus requirement, reasoning that these additional hurdles have "no basis in our precedents and, indeed,

---

would be admissible when determining the question of guilt: "When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in *Furman*." *Gregg*, 428 U.S. at 191–92.

[5]The majority's comparison of an element of the offense to the "moonphase that day" underscores its unwillingness to engage in a meaningful analysis of the third category the Supreme Court has outlined as mitigation—circumstances of the offense. The majority's comparison of the location of the body to the moonphase that day is apt in one respect, however. During the guilt phase, the jury, too, was likely to have regarded the disputes over where Timmerman died and whether she was asphyxiated or drowned as no more relevant to the question of Gabrion's guilt than the moonphase that day. Jurors convinced beyond a reasonable doubt that a defendant has murdered in cold blood are highly unlikely to then find the defendant not guilty based on doubts as to the location of the murder or the manner of death. In the face of overwhelming evidence that Gabrion murdered Timmerman, the jurors likely spent little time focusing on the seemingly irrelevant question whether the murder took place on federal lands or the degree to which they were convinced of that morally irrelevant fact. But, having rendered a guilty verdict, and then turning to the question whether Gabrion should receive the death penalty, some jurors might have viewed the morally irrelevant issue of the location of the murder as having new significance, far more relevant than the moonphase that day, had they been informed that the location was the single factor that made the murder a federal crime, thereby exposing Gabrion to the death penalty, which would not have been an option had the murder been committed 227 feet to the north.

[are] inconsistent with the standard we have adopted for relevance in the capital sentencing context." 542 U.S. at 287. The Court further identified the role of a federal appellate court regarding mitigation evidence: "to say that only those features and circumstances that a panel of federal appellate judges deems to be severe . . . could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Id.* (internal quotation marks omitted).

Accordingly, we are not charged with excluding evidence that is not *morally* relevant. Rather, we must uphold a defendant's right to present evidence that is *constitutionally* relevant. That the majority considers Gabrion's evidence morally unpersuasive is of no matter. Courts determine whether evidence is constitutionally relevant, much of which addresses moral culpability, and that evidence is relied upon by the jury to make a reasoned moral judgment. If evidence meets the low constitutional bar established by Supreme Court—which it unequivocally does here—then it must be allowed in. The majority deprives Gabrion of his Eighth Amendment right to present constitutionally relevant mitigation evidence.

### 2. Federal Death Penalty Act

Gabrion's constitutional right to present mitigation evidence is distinct from his statutory right to present mitigation evidence under the FDPA. Under § 3592(a), "the finder of fact shall consider any mitigating factor," including a list of seven specific factors and an eighth category requiring consideration of "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a). The parties debate whether these eight categories are exhaustive, how broadly to read this eighth category if they are, and most importantly, whether the information about Michigan qualifies under any of these readings. The majority ultimately concludes that it does not, relying on the unfounded assumption that Congress limited the protections in § 3592(a) to the constitutional minimum. Because I believe the FDPA allows a defendant to introduce evidence beyond the constitutional minimum, I cannot agree.

As an initial matter, I remain confounded as to how evidence relating to an element of the offense does not qualify as a "circumstance of the offense" under § 3592(a)(8). The majority once again refuses to engage in this analysis, choosing instead to rely upon unsupported assertions, namely that § 3592(a) is based in the same moral principles as the majority's novel relevance standard. Even assuming, though, that an element of the offense is somehow outside the scope of § 3592(a)(8), the expansive nature of § 3592(a) as a whole requires permitting Gabrion to present this evidence. By its own language, the § 3592(a) list is non-exhaustive and merely illustrative. The first indication of § 3592(a)'s expansive nature is reflected in the initial preface, where Congress stated that the jury "shall consider *any* mitigating factor." *Id.* (emphasis added). Congress subsequently used the open-ended word "including" when listing the enumerated examples of mitigating factors. *Id.* The majority does not account for this open-ended language in any meaningful way, focusing instead on reiterating its constitutional argument by pointing to the similarities between the language of the eighth factor and the constitutional standard set forth by the Supreme Court.

The government's only argument in response is that the existence of the eighth category would be "superfluous" if the words "any mitigating factor" are given broader meaning, but the government fails to explain how this list is any different from other illustrative lists. As explained by the Fifth Circuit when rejecting a similar argument relating to aggravating factors under the FDPA, "'[i]t is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."'" *United States v. Robinson*, 367 F.3d 278, 293 (5th Cir. 2004) (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). The merits panel correctly concluded that purely as a matter of statutory interpretation, defense counsel is entitled to argue any point that "could conceivably make a juror question the appropriateness in the case of imposing a sentence of death." *United States v. Gabrion*, 648 F.3d 307, 326 (6th Cir. 2011), *reh'g en banc granted, op. vacated* (6th Cir. Nov. 17, 2011). The government

does not even try to argue that this evidence could not even "conceivably" bear on a juror's decision of whether death was justified under this standard.

Perhaps the strongest evidence in support of an expansive reading of § 3592(a) is found in the interpretations of other FDPA provisions. Specifically, our sister circuits have consistently interpreted §§ 3592(b), (c), and (d) and 3593(a), the aggravating-factor provisions, as expansive. These interpretations are instructive, as the aggravating-factor provisions employ the same terms that are at issue in the mitigating-factor provision. Each provision relating to non-statutory aggravating factors in § 3592 states as follows: "The jury, or if there is no jury, the court, may consider whether *any* other aggravating factor for which notice has been given exists." § 3592(b), (c), and (d) (emphasis added). Additionally, § 3593(a) prescribes that "[t]he factors for which notice is provided under this subsection *may include* factors concerning the effect of the offense on the victim and the victim's family . . . and *any* other relevant information." *Id.* § 3593(a) (emphasis added).

Certain circuits base their interpretations on the plain language of the terms at issue. For example, the Fourth Circuit has explained that "the text of [§ 3593(a)] is illustrative rather than exhaustive, identifying some kinds of aggravating factors and evidence that the prosecution's notice to the defendant '*may* include' and concluding with a catchall permitting the prosecution to present 'any other relevant information.'" *United States v. Runyon*, 707 F.3d 475, 501 (4th Cir. 2013) (quoting § 3592(c)). Given this language, the court determined that Runyon, in arguing for a more restrictive interpretation, was "creating restrictions . . . out of whole cloth." *Id.* Likewise, the First Circuit indicated that "[t]he FDPA broadly provides that the government may present any information relevant to an aggravating factor for which notice has been provided." *United States v. Sampson*, 486 F.3d 13, 44 (1st Cir. 2007) (internal quotation marks and alteration omitted). Finally, the Tenth Circuit explained that "the use of the phrases 'may include' and 'any other relevant information' clearly suggests that Congress intended to permit the admission of any other relevant evidence, including, as authorized by *Payne*, evidence giving the jury a glimpse of the victim's

personality and the life he led." *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007).

Even more notable, though, are the circuits that have expressly compared the terms found in the mitigation provision with those in the non-statutory-aggravators provision in order to establish the FDPA's expansiveness. For example, the Fifth Circuit asserted that the breadth of the non-statutory-aggravators provision is supported by that of the mitigation provision: "The statute provides that the jury may consider such determinations in reaching its decision to recommend death, just as it permits the jury to consider any mitigating factors not specified in the statute." *Robinson*, 367 F.3d at 293. In support of this assertion, the court compared the language in § 3592(a)—"'the finder of fact shall consider any mitigating factor, including the following' eight specified factors"—with the language in § 3592(c)—"'the jury . . . may consider whether any other aggravating factor for which notice has been given exists.'" *Id.* at 293 n.23 (quoting § 3592(a), (c)).

Additionally, the Second Circuit referred expressly to § 3592(c) in interpreting § 3593(a), the provision allowing victim-impact statements to be presented as a non-statutory aggravating factor, as expansive:

> We read [§ 3593(a)] as language of inclusion, not exclusion. It speaks to what "may be included." . . . *see also* 18 U.S.C. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."). The final phrase ("and any other relevant information"), though ambiguous, is read most naturally as a catch-all for what may be deemed "relevant" by the court.

*United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010) (internal citations and alterations omitted). In a different case, the Second Circuit again touched on the expansiveness of both aggravating and mitigating factors: "the Supreme Court has also made clear that in order to achieve such 'heightened reliability[]' [in imposing the death sentence,] *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors." *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) (citing *Gregg*, 428 U.S. at 203–04).

Against this backdrop, § 3592(a) must be read as inclusive. I therefore cannot agree with the majority's interpretation of this provision, or with its refusal to address the "circumstance of the offense" language in § 3592(a)(8). For these reasons, I believe the district court erred in denying Gabrion's request to admit evidence relating to the location of the offense.

### 3. Residual Doubt

Even assuming there is no constitutional right to present a residual-doubt argument, Gabrion should have been allowed to raise this argument under the FDPA. It cannot be disputed that the FDPA allows a defendant to proffer evidence of certain types of residual doubt. For example, a defendant may present evidence that he "was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(2). Similarly, the FDPA permits evidence that "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge," and that "the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge." *Id.* § 3592(a)(1), (3). The FDPA also allows the defendant to present evidence that "[t]he defendant committed the offense under severe mental or emotional disturbance." *Id.* § 3592(a)(6).

Each of these subsections thus allows a reevaluation by the jury during the penalty phase of the same evidence presented during the guilt phase. And, given that the penalty phase is under way, this is undoubtedly evidence that the jury found unpersuasive concerning one of the elements of the offense during the guilt phase. *Cf. Oregon v. Guzek*, 546 U.S. 517, 523 (2006) (explaining that a capital defendant did not have a constitutional right to present new alibi evidence at a resentencing for a prior conviction, but "to the extent it is evidence he introduced at [the time of the original trial], he is free to introduce it now, albeit in transcript form").

The majority's conclusion that Gabrion is barred from presenting evidence of the location of the offense—first because it "was an issue extensively litigated during the guilt phase of Gabrion's trial" and second because the jury had already "found beyond a reasonable doubt that Gabrion killed Timmerman inside the Forest"—therefore cannot be extended to the FDPA, as the principle that *all* relitigation is precluded under the FDPA would not comport with the plain language of the statute. Maj. Op. at 17. The FDPA expressly permits relitigation of elements of an offense, and I cannot see any logic in an arbitrary determination that evidence concerning the location of the offense is one that must be precluded. The district court should have allowed Gabrion to present residual-doubt evidence under the FDPA.

Finally, even if the FDPA does not require the court to instruct the jury on this evidence, Gabrion's counsel should not have been forbidden from presenting this argument in closing arguments, an issue left unaddressed by the majority.[6] *Lockhart v. McCree*, 476 U.S. 162, 181 (1986) ("Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases.") (internal quotation marks omitted); *Moore v. Mitchell*, 708 F.3d 760, 788 (6th Cir. 2013) (recognizing residual doubt as a mitigation theory); *Webb v. Mitchell*, 586 F.3d 383, 394–95 (6th Cir. 2009) (discussing residual-doubt theory raised at mitigation), *cert. denied*, 130 S. Ct. 2110 (2010); *Hawkins v. Coyle*, 547 F.3d 540, 548 (6th Cir. 2008) (noting that arguing residual doubt at mitigation was a "strategy endorsed" by the Supreme Court and the Ohio Supreme Court at the time of defendant's trial in 1989), *cert. denied*, 130 S. Ct. 553 (2009); *Scott v. Mitchell*, 209 F.3d 854, 881–82 (6th Cir. 2000) (decision by counsel to pursue residual-doubt theory at mitigation not "objectively unreasonable"), *cert. denied*, 531 U.S. 1021 (2000). If such theories are deemed positions pursued by reasonable counsel, it is difficult to call them now wholly irrelevant to mitigation.

---

[6]I agree with Gabrion that the government's suggestion that Gabrion's counsel could have made this argument anyway is absurd in light of the district court's ruling specifically prohibiting this testimony. *See* Supplemental Appellee Br. on Reh'g at 21–22; Supplemental Reply Br. on Reh'g at 12.

**B.  Balancing Factors "Beyond a Reasonable Doubt"**

The only relevant question on this issue is whether the jury must determine that the aggravating factors substantially outweigh the mitigating factors in order for Gabrion to be sentenced to death.  Because I believe that the answer to that question is "yes," that determination must be made beyond a reasonable doubt.

**1.  *Apprendi* and the FDPA**

Under *Apprendi*, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  530 U.S. at 490.  The Supreme Court made clear in *Apprendi* that the state's use of the term "sentence enhancement" had no bearing on the inquiry.  *Id.* at 476.  When "a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others," those circumstances that lead to the increase in the authorized penalty must be submitted to a jury and proven beyond a reasonable doubt.  *Id.* at 484.

The rule is no different in death-penalty cases.  "The dispositive question . . . is one not of form, but of effect."  *Ring v. Arizona*, 536 U.S. 584, 602 (2002) (internal quotation marks omitted).  If a finding leads to "an increase in a defendant's authorized punishment," that finding must be found by a jury beyond a reasonable doubt—"no matter how the State labels it."  *Id.*  For example, because Arizona's enumerated aggravating factors are necessary for the imposition of the death penalty, they "operate as 'the functional equivalent of an element of a greater offense,' [and] the Sixth Amendment requires that they be found by a jury."  *Id.* at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19) (internal citation omitted).

Two years after *Ring*, the Supreme Court—for a third time—rejected a state's attempt to find a linguistic loophole.  In *Blakely v. Washington*, 542 U.S. 296 (2004), the state argued that the "statutory maximum" for the crime in question was ten years, and technically under the statute it was.  *Id.* at 303.  But the Supreme Court ignored the state's labels—because the statute permitted the ten-year maximum only if there were

sufficient reasons to justify the "exceptional sentence," the true maximum for the defendant for *Apprendi* purposes was not ten years.  *Id.* at 304–05.  "Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence." *Id.* at 305.  The first question is therefore not a constitutional question but simply a statutory one:  What does the FDPA require in order to sentence someone to death?

Although it is true that the FDPA forbids the imposition of the death penalty unless at least one aggravating factor listed in § 3592 is unanimously found to exist beyond a reasonable doubt, the death penalty is authorized only if the jury (under the statute) then decides that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death."  18 U.S.C. § 3593(e).[7]  Before this determination is made, a sentence of death is simply not an option.  Even when there are no mitigating factors, the death penalty is still not authorized (again, under the statute) unless the jury finds that "the aggravating factor or factors alone are sufficient to justify a sentence of death."  *Id.* Under the plain terms of the FDPA, the district court could not impose the death penalty solely on the grounds that the jury found an aggravating factor and the requisite intent. *Blakely*, 542 U.S. at 305.  The statutorily authorized sentence increases to death only after the jury determines that the aggravating factors sufficiently outweigh the mitigating factors to justify the sentence of death, and not a moment before.

The language of § 3591 further supports this interpretation.  According to its terms, a defendant found guilty of an underlying offense "shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified."  18 U.S.C. § 3591(a).  Section 3591 thus instructs us in two meaningful ways. First, § 3591 directs us to § 3593 as a whole rather than to any specific subsection.

---

[7]Everyone agrees that § 3593(e) itself states no burden of persuasion on this issue.  Some state statutes, however, do explicitly provide that the jury must find that the aggravators must outweigh the mitigators beyond a reasonable doubt.  *Gabrion*, 648 F.3d at 326 (6th Cir. 2011).

Second, § 3591 provides that a court cannot sentence a defendant to death until the jury determines that death is justified—i.e., after the jury weighs the aggravators and any mitigators pursuant to § 3593(e).

This makes the balancing of factors a "fact" for sentencing purposes under the FDPA. We were clearly instructed in *Blakely* that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." 542 U.S at 303–04. Here, without the balancing, the maximum sentence the judge can impose under the statute is life in prison. Because the death penalty could not be imposed by a judge under the FDPA but for the balancing by the jury—and the majority does not offer a colorable argument otherwise—whether the court calls the jury's balancing a "finding of fact," a "mixed question of law and fact," or "Mary-Jane" is irrelevant. "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." *Id.* at 304 (internal quotation marks and citation omitted).

At the very heart of *Apprendi* was a rejection of labels as a means of analyzing constitutional rights. 530 U.S. at 476 ("Merely using the label 'sentence enhancement' to describe [one of the procedural safeguards] surely does not provide a principled basis for treating them differently."). Because the clear language of the FDPA requires the jury to conduct this balancing before a defendant can be sentenced to death, the merits panel correctly held that "a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact." *Gabrion*, 648 F.3d at 325.

### 2. "Death-Eligibility"

Rather than adhere to the Supreme Court's directive to look beyond labels, the majority throws yet another label into the mix. Specifically, the majority contends that a defendant becomes "death-eligible" the moment that the jury finds a statutory aggravating factor beyond a reasonable doubt. Maj. Op. at 29, 31. Once "death-

eligibility" attaches, the majority reasons, the jury need not make any additional findings of fact in order for the defendant to receive a sentence of death. Because this argument relies on unsupported assumptions and logical leaps, I cannot agree.

As an initial matter, I find the majority's analysis as to when "death-eligibility" would attach to be unsatisfactory. In my view, choosing a point at which a defendant becomes so-called "death-eligible" under the FDPA other than at the completion of a § 3593 hearing is nothing short of arbitrary. The majority's brief analysis makes no effort to explain why a defendant would become "death-eligible" upon the jury's finding an aggravating factor. Instead, the majority cites *Jones v. United States*, 527 U.S. 373 (1999), a pre-*Apprendi* case that does not squarely address the issue, which in turn cites § 3593(e) for a general proposition.[8] *Id.* at 376–77. But § 3593(e) does not include the term "death-eligible," nor does it prescribe that "a death sentence may not legally be imposed unless at least one aggravating factor is found to exist beyond a reasonable doubt," as did the Arizona scheme in *Ring*. *Ring*, 536 U.S. at 597 (internal quotation marks and alteration omitted). Under the FDPA, finding an aggravating factor beyond a reasonable doubt is one of many prerequisites to imposing the death penalty; it is not the point of no return.

I must also note that contrary to the majority's suggestion, "death-eligibility" is not the cornerstone of *Apprendi*. Rather, "death-eligibility" is an ambiguous term, used in a variety of ways depending on the jurisdiction. The majority makes no attempt to define this term or explain its importance. This is troubling, given that federal courts typically use this term as it relates to the FDPA to describe whether a defendant could ever receive a sentence of death based on his purported conduct, often at the indictment stage. *See, e.g.*, *United States v. Parks*, 700 F.3d 775, 778 (6th Cir. 2012) ("In enacting the FDPA, Congress increased the number of death-eligible offenses *in toto*."); *United*

[8]The six circuit courts to have addressed this issue thus far mirror the majority's approach and are also lacking in any statutory analysis. *See Runyon*, 707 F.3d at 516; *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008); *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).

*States v. Lawrence*, 555 F.3d 254, 264 (6th Cir. 2009) ("Third, if the jury finds both a death-eligible offense and one or more of the statutory aggravating factors, the jury considers whether the statutory aggravating factor or factors found to exist, together with any non-statutory aggravating factors found to exist upon proof beyond a reasonable doubt, sufficiently outweigh the mitigating factor or factors found to exist, so as to justify a sentence of death."). Moreover, there is nothing to support the theory that a jury ceases to find facts once "death-eligibility" attaches. The majority's application of an undefined placeholder avoids engaging in a meaningful *Apprendi* analysis and raises more questions than it answers.

### 3. Weighing Evidence

Additionally, I cannot agree with the majority's contention that weighing aggravators and mitigators is qualitatively different than finding facts for the purposes of *Apprendi*. Because the jury must *weigh* the aggravating factors against the mitigating factors under § 3593(e), the majority surmises, this determination cannot constitute a finding of fact. Maj. Op. at 30. According to the majority, the type of decision that has been deemed a finding of fact under *Apprendi*, such as whether a defendant was the triggerman, is binary, thus requiring only a response to a simple yes-or-no question.

This reasoning, however, misapprehends the function of the jury. Asking a jury to weigh evidence, in this case evidence that aggravates against evidence that mitigates, is not unique to the penalty phase of a capital trial. Rather, it is the sole task of a jury at every stage of every proceeding. Indeed, juries are frequently tasked with reaching subjective conclusions of great import beyond a reasonable doubt. *See United States v. Gaudin*, 515 U.S. 506, 514–15 (1995) (holding jury's responsibility often includes applying law to facts when drawing ultimate conclusions such as guilt, but that such conclusions must still be reached beyond a reasonable doubt).

When a jury determines whether a homicide was committed in self-defense, for example, it weighs the evidence presented at trial. Imagine a trial where the government presents testimony from eyewitnesses who describe a confrontation

between the defendant and the victim.  All agree that the defendant shot the victim, and all give the same general account of the victim's actions preceding the shooting.  The defendant takes the stand and testifies that he thought the victim was about to shoot him and therefore shot the victim first, in self-defense.  During deliberations, the jury's focus would not be on the type of binary yes-or-no fact finding contemplated by the majority.  Rather, the jury would be required to engage in a balancing of the objective facts with personal and moral judgment to determine if it was reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat.  *See* Sixth Circuit Criminal Pattern Jury Instructions § 6.06 (2009).  Jurors must deliberate on similar issues when considering a coercion/duress defense.  *See id.* § 6.05 (2009).  These judgments are not binary yes-or-no decisions that depend on which version of the facts a jury believes.  Rather, they entail value-laden balancing of the sort involved when a jury is asked to recommend life or death.  *See Brown v. Sanders*, 546 U.S. 212, 216–17 (2006) ("[W]e have held that in *all* capital cases the sentencer must be allowed to weigh the facts and circumstances that arguably justify a death sentence against the defendant's mitigating evidence.").  "While the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral judgment."  *Sawyer v. Whitley*, 505 U.S. 333, 370 (1992) (Stevens, J., concurring).

Moreover, the comparison is not altered, as the majority suggests, by the formal nature of the penalty phase, in which the jury weighs only those facts that it has already specifically found as a special finding.  Rather, the formality of the penalty phase serves as a safeguard against determinations made arbitrarily or for an impermissible reason, thus ensuring the constitutionality of the ultimate decision.  *Woodson*, 428 U.S. at 305 ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.");  *see also Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("Given the awesome power that a sentencing jury must exercise in a capital

case, it may be advisable for a State to provide the jury with some framework for discharging these responsibilities."); *Lockett*, 438 U.S. at 604 ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); *Gregg*, 428 U.S. at 192–93 ("The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition.").

As explained in *Gregg*, "[w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." 428 U.S. at 195. Without such safeguards, "[a] system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Id.* at 195 n.46. Much like the requirement that a jury make an individualized determination, the formal nature of the penalty phase under the FDPA preserves the constitutionality of the death penalty.

As with any decision that requires weighing factors—even factors that each objectively exist beyond a reasonable doubt—the proper weight itself can be difficult to decide. Is it really so surprising that some would weigh factors and answer "absolutely" and others would say "I think so?" And when the decision on the line is whether to take the life of another human, is it really too much to ask that the jury's answer be "yes, beyond a reasonable doubt," and not just "yes, I'm pretty sure?" *See Ring*, 536 U.S. at 589 ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").

### 4. Sentencing Under 18 U.S.C. § 3553(a)

The majority also compares § 3593(e) with § 3553(a), implying that today's decision may have an impact on sentencing under § 3553(a). As an initial matter, our ruling today cannot be incorrect merely because it may reveal potential problems with

how courts have interpreted § 3553(a) to date. Our duty is to decide the case and controversy before us, not future cases or controversies that have not been presented to us. But more importantly, today's analysis is not likely to impact how courts apply § 3553(a) during noncapital sentencing, as § 3553(a) is distinguishable from § 3593(e) for purposes of *Apprendi*. The parsimony provision instructs the judge to impose a sentence no "greater than necessary" to achieve the remaining sentencing objectives listed in the statute. Unlike the weighing in § 3593(e), such a finding does not increase the statutory maximum; indeed, in many ways § 3553(a) is Congress restating the principle that the statutory maximum is the "maximum [the court] may impose *without* any additional findings." *Blakely*, 542 U.S at 303–04.

Furthermore, even if we could call it a factfinding, "[j]udicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments." *Harris v. United States*, 536 U.S. 545, 558 (2002). "[N]othing in [our] history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 U.S. at 481. The parsimony provision does not expand or contract the range prescribed by statute, but merely codifies these principles to reflect Congress's position on the extent of discretion federal district judges should have when imposing sentences within the permissible range. Given these critical distinctions, I cannot agree with the majority's conclusion that § 3553(a) and § 3593(e) are indistinguishable for the purposes of *Apprendi*.

## II.  VOIR DIRE

Gabrion argues that his Sixth and Fourteenth Amendment rights to an impartial jury were violated by the district court's biased exclusions of jurors for cause. Specifically, Gabrion outlines three ways in which these rights were violated: (1) the district court erred by excluding four jurors who leaned against the death penalty, (2) the district court erred by not having excluded three jurors who leaned in favor of

the death penalty, and (3) the district court's exclusion and inclusion of these jurors resulted in a venire tilted toward capital punishment.  The majority deems each of these arguments meritless in light of the broad discretion afforded to the district court when selecting a jury.  Because I believe that the district court improperly excluded two jurors, which resulted in a venire tilted in favor of capital punishment, I cannot agree.

**A.  Exclusion of Anti-Death-Penalty Jurors**

Gabrion argues that his death sentence is unconstitutional based on the exclusion of four death-qualified jurors who were improperly excluded from the venire: Abrahams, Donahey, Hemmeke, and Groves.  The majority rejects this argument, highlighting the discretion a district court holds in selecting a jury.  The voir-dire transcript demonstrates, however, that both Abrahams and Donahey each clearly stated multiple times that despite their personal misgivings about the death penalty, they would be able to follow the instructions of the district court and follow their oaths.  This is all the law requires.

The government faces a significant burden when it wishes to remove a juror for cause, for its "power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths."  *Gray v. Mississippi*, 481 U.S. 648, 658 (1987).  When the government seeks to exclude a juror for bias, it "must demonstrate, through questioning, that the potential juror lacks impartiality.  It is then the trial judge's duty to determine whether the challenge is proper."  *Morgan v. Illinois*, 504 U.S. 719, 733 (1992) (internal quotation marks and emphasis omitted).  Quite simply, I do not believe the government established a lack of impartiality here.

When a juror is excluded improperly for cause on the basis that she opposes the death penalty, the sentence of death is rendered unconstitutional.  *Adams v. Texas*, 448 U.S. 38, 51 (1980) ("Accordingly, the Constitution disentitles the State to execute a sentence of death imposed by a jury from which such prospective jurors have been excluded.").  Because I believe that the district court erred in excluding Abrahams and

Donahey, both of whom stated clearly that they could put their personal beliefs to the side in order to follow the instructions of the court, I would vacate Gabrion's sentence.

### 1. Abrahams

The district court explained its reasoning for excluding Abrahams as follows: "Well, I think there are two issues here.  He can consider both. . . . Would he—not would he, could he impose either one?  And when it says could he impose either one, on the government's question and on my question he said I don't know.  Now he says he'll consider it."  2 Jury Trial 562:19–24.  The district court then reasoned that although "normally I would say if he says I'll consider both of them, that's normally all right.  But if it's preceded with I don't know if I could do it and then I ask him, Could you, and he says I don't know, I think it's grounds for excusal."  *Id.* at 563:2–6.  The district court coined this a "close question," but ultimately determined "it's grounds for excusal because of his hesitancy and the honesty with which he's approached it."  *Id.* at 563:6–8.

As an initial matter, "[i]t is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."  *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).  "[I]t cannot be assumed that a juror who describes himself as having conscientious or religious scruples against the infliction of the death penalty or against its infliction in a proper case thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him."  *Witherspoon v. Illinois*, 391 U.S. 510, 515 n.9 (1968) (internal quotation marks and citation omitted); *see also id.* at 529 (Douglas, J., concurring) ("Those with scruples against capital punishment can try the case according to the law and the evidence, because the law does not contain the inexorable command of an eye for an eye.") (internal quotation marks omitted).

Taken in context, Abrahams's hesitancy clearly relates to how he would weigh the aggravators and mitigators in order to reach an ultimate decision, not to whether he

would be able to engage in such a task.  And it is clear that the former does not reflect the sort of partiality that requires excusal for cause.  Abrahams's hesitancy is first seen during the initial line of questioning:

> THE COURT:  Could you do that if the instructions of this Court and the law dictated that?
>
> JUROR ABRAHAMS:  Um, I believe on my questionnaire that I said that I would be fair in a judgment of the death sentence.  But in the past couple of weeks I'm not really unclear, but I'm more unsure of if I could outweigh the sentence of life imprisonment over death or vice versa.  It's just something that I've never had to deal with or—excuse me, so it's—
>
> THE COURT:  Right.  That can be appreciated.  I think the inquiry at this point is if you made up your mind or if you would follow the facts and follow the law—
>
> JUROR ABRAHAMS:  Yes.
>
> THE COURT:  —and be able to fairly, impartially impose either one of them if the evidence and the law dictated that.
>
> JUROR ABRAHAMS:  Yes, sir.

2 Jury Trial 554:3–19.  Gabrion's attorney then asked Abrahams similar questions:

> MR. STEBBINS:  . . . Now, do you think you can consider these options at that point, listen to this evidence and fairly consider whether the death sentence is appropriate or a life sentence is appropriate?
>
> JUROR ABRAHAMS:  At this point, yes, I do believe that I could.
>
> MR. STEBBINS:  You could consider that?
>
> JUROR ABRAHAMS:  I could consider it, yes.
>
> MR. STEBBINS:  And you don't think anything in your thoughts you've had, these concerns you've had over the last couple of weeks will prevent you from making that determination?
>
> JUROR ABRAHAMS:  I don't think it would prevent me, no, sir.  It's just a consideration that I wish to be heard.  That's all I had.

*Id.* at 560:6–20.  When the district court reconvened its questioning, Abrahams did not waffle as to his ability to impose a death sentence, as described by the majority.  Rather,

Abrahams stated clearly for a third time that imposing the death sentence is something he "could seriously consider if the facts and circumstances were such that it was open for consideration." *Id.* at 561:6–9. Abrahams then repeated his earlier hesitancy as to which he would choose:

> That's what I'm trying to express, that I don't know for sure that I could go through the whole trial and, for instance, them prove him guilty and then go through the second part of the trial for sentencing, that I could say life imprisonment or death. I honestly don't know. That's the point that I was trying to get across. Very unsure of what I could say yes or no to, either way.

*Id.* at 561:15–22.[9] Here, Abrahams is not stating that a personal viewpoint would preclude him from finding that death is justified. Rather, he is expressing that he has no preconceived notion of how he would react to this unique process, and "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Adams*, 448 U.S. at 50.

Concerning the statements to which the majority directs us—Abrahams's admission that his moral values would be on his mind while deliberating as to life or death—the Supreme Court has stated that the government cannot "exclude jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected." *Id.* at 50–51. If a juror states consistently that he would be able to apply the law to the facts notwithstanding his moral beliefs, he cannot be excluded for cause. Abrahams did not resist rehabilitation, as suggested by the majority; he simply continued to express hesitancy as to the great responsibility he would be undertaking as a juror, which has never been sufficient to require exclusion. The majority's stated reasons for upholding the district court's

---

[9] It is important to note that unlike with juror Groves, whose exclusion Gabrion also challenges, the district court did not make note of any nonverbal indications that Abrahams would be unable to consider imposing a sentence of death. When giving his reasoning regarding Groves, the district court stated "I think in the context of his saying, Yes, I could consider it, and he winces and bobs and weaves a little bit when he does that, I think he's really not qualified." 2 Jury Trial 385:4–7.

exclusion of Abrahams are thus contrary to binding authority and the plain language of the voir-dire transcript.

### 2. Donahey

The majority employs a similar approach with respect to Donahey, claiming that he equivocated and rendered ambiguous answers. However, I cannot agree. Donahey opposed the imposition of the death penalty on a personal level, yet was adamant in stating that he would temporarily yield these beliefs to fulfill his duty as a juror. When initially questioned by the court as to his moral views regarding the death penalty, Donahey responded as follows:

> THE COURT: No, I understand. And so the question comes down to whether you could impose it or whether you would find yourself unable to.
>
> JUROR DONAHEY: Okay. So I interpreted that as whether—I mean, if it was up to me.
>
> THE COURT: Oh, okay.
>
> JUROR DONAHEY: You know what I'm saying? That's the way I interpreted it. So you're saying that if all the factors came out in the mitigating, because the law says it's a possibility, could somebody find it. And I suppose, as personally distasteful as it would be, I would have to go with it.
>
> THE COURT: Which means?
>
> JUROR DONAHEY: I would follow what the law would tell me to do on that.

1 Jury Trial 93:18—94:7. Donahey thus falls squarely within the category of jurors described in *Lockhart* as being death-qualified—those who personally oppose the death penalty yet affirm their ability to put their views to the side in order to adhere to their oath as a juror. 476 U.S. at 176.

The majority insists, however, that Donahey equivocated, pointing to a statement where he describes his *personal* views on the death penalty, as is made evident when placed in context:

MR. DAVIS:  In answering the question that was put to you by the questionnaire, you said that the death penalty was morally wrong.

JUROR DONAHEY:  Um-hum.

MR. DAVIS:  Could you explain that?

JUROR DONAHEY:  Well, as I expressed, if we're trying to have a society that says, you know, killing is wrong, yet we invoke that as a punishment, there seems to be something contradictory there.  I mean, our laws and stuff are reflective of our morals, and then there's a contradiction there.  And then particularly in the recent past there seems to be with now DNA testing more and more verdicts that have been overturned.  People that have been sentenced to die were cleared eventually.  And to take life because they took someone else's life, you know, somewhere down inside me, it just doesn't seem right, you know.

So maybe when I say morally, maybe I could have expressed it a little better.  But I wasn't looking at—you know, I was filling something out, you know, basically to get it done with and not writing some kind of, you know, paper on it, you know.

Jury Trial 94:16–95:11.[10]  Later in the same colloquy, Donahey responded to a question that his views on the death penalty might interfere with his ability to make a judgment. *Id.* at 95:16–20.  Donahey expanded on this answer in response to a question by Gabrion's attorney, stating that the decision "would be very difficult" but that he "could consider" the death penalty.  *Id.* at 98:24–99:8.

The majority and the district court both contend that Donahey equivocated as to whether he could consider imposing a sentence of death.  *Id.* at 100:21–24.  My review of the voir-dire testimony, however, reveals no evidence of this purported equivocation.  Donahey expressed that he personally opposed the death penalty, but stated that as a juror he would follow the instructions of the court, "as personally

---

[10]It is clear from the transcript that Donahey was confused by the wording of this question on the questionnaire.  In both passages, Donahey explains his initial confusion when he filled out the questionnaire, as he thought it was asking about his personal beliefs.  Once the judge clarified that the critical issue is whether he could follow his oath despite those beliefs, Donahey stated clearly that he would be able to follow instructions and place his personal beliefs aside.  The selective quotations cited by the majority do not reflect this dynamic of Donahey's voir dire.

distasteful as it would be." *Id.* at 94:2–3.[11] Moreover, as evidenced by the above-quoted testimony, the district court's statement that Donahey "was unable to say that he would be able to" consider the death penalty is plainly incorrect. *Id.* at 101:1–2.

Additionally, I find it contradictory for the majority to disregard Donahey's statement that he would be able to consider imposing the death sentence because "that answer came in response to a leading question," yet rely heavily on "a leading question from the prosecutor, that his views about the death penalty 'might' interfere with his 'ability to make a judgment as to sentencing.'" Maj. Op. at 22–24. Finally, I am unclear as to why any purported ambiguity in Donahey's testimony should play a role in the analysis, given that this was not a reason proffered by the district court for excluding Donahey. The majority does not explain why this should be considered by this court, nor does it explain how Donahey's testimony was in fact ambiguous. Ultimately, Donahey was improperly excluded by the district court as a result of his personal opposition to the death penalty.

### 3. Groves

Although I agree with the majority that the first two reasons given by the district court were sufficient to exclude Groves, I do not agree with the district court's insinuation that Groves could have been excluded based on his view that the death penalty should be reserved for extreme cases, such as those involving mass murders. 2 Jury Trial 385:1–2. The Supreme Court has stated expressly that jurors "cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment." *Witherspoon*, 391 U.S. at 522 n.21; *see also Gregg*, 428 U.S. at 182 ("Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most

---

[11]Comparing Donahey's statements with those made by Hemmeke, another juror whose exclusion Gabrion challenges, is instructive. Unlike Donahey, Hemmeke responded on his questionnaire that he "could never, regardless of the facts and circumstances, return a verdict which imposed the death penalty." 2 Jury Trial 509:24–510:1. Further contrary to Donahey, Hemmeke answered the district court's initial inquiry as to whether he could consider imposing a sentence of death by stating, "I'm pretty set in the no death penalty." *Id.* at 511:1. These kinds of statements, that go to one's ability to consider imposing the death penalty, differ vastly from those made by Donahey, who established that although he personally opposed capital punishment, he would put those views aside for the purposes of deliberations.

irrevocable of sanctions should be reserved for a small number of extreme cases."). This is because "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him." *Id.*

**B.  Venire Tilted in Favor of Capital Punishment**

Contrary to the majority's assertion, Gabrion has identified a constitutional basis for his claim that the jury-selection process was lopsided:  "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007).  Because the district court improperly excluded jurors based on their personal beliefs on the death penalty, I believe the venire in Gabrion's case was tilted in favor of capital punishment.  I would vacate Gabrion's death sentence on this ground for the reasons stated above.

## III.  CONCLUSION

For all of these reasons, I respectfully dissent.  I would vacate Gabrion's sentence of death and remand for a new penalty hearing.